```
              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

 LVB-OGDEN MARKETING, LLC,       )
                                 )
               Plaintiff,        ) CASE NO. C18-243 TSZ
 v.                              )
                                 ) SEATTLE, WASHINGTON
 DAVID S. BINGHAM, et al.,       ) May 3, 2018
                                 )
               Defendants.       ) MOTION HEARING
                                 )
                                 )
_____

              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS S. ZILLY
              UNITED STATES DISTRICT JUDGE
_____


 APPEARANCES:

  For the Plaintiff:     TAMMY ANN TSOUMAS
                         JONATHAN J. FARIA
                         HEATHER CANNER
                         Kirkland & Ellis LLP
                         333 S. Hope Street
                         Los Angeles, CA 90071

                         JEFFREY L. WILLIAN
                         Kirkland & Ellis
                         300 North Lasalle
                         Chicago, IL 60654

                         WILLIAM RANDOLPH SQUIRES, III
                         Corr Cronin Michelson Baumgardner
                         Fogg & Moore LLP
                         1001 4th Avenue, Suite 3900
                         Seattle, WA 98154-1051


  For the Defendants     R. BRUCE JOHNSTON
  Bingham Individuals,   NATHAN J. ARNOLD
  CCRB Enterprises, and  Johnston Jacobowitz & Arnold, PC
  Bingo Investments:     2701 First Avenue, Suite 340
                         Seattle, WA 98121
```

```
For the Defendant        SCOTT B. HENRIE
Park Place Motors:       MANISH BORDE
                         Williams Kastner & Gibbs
                         Two Union Square
                         601 Union Street, Suite 4100
                         Seattle, WA 98101


For the Defendants       DENNIS JOHN MCGLOTHIN
BGH Holdings, LLC,       Western Washington Law Group PLLC
Henry Dean, and          7500 212th Street SW, Suite 270
Cicilia S. Elali:        Edmonds, WA 98026




Reported by:             NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov
```

```
1    May 3, 2018                              9:05 a.m.
                            PROCEEDINGS
2    _____

3          THE COURT:  Good morning, ladies and gentlemen.  It

4    looks like we have a full courtroom today.  Please be seated.

5        Will the clerk please call the calendar.

6          THE CLERK:  Case No. CR18-243-TSZ, LVB-Ogden

7    Marketing, LLC v. Bingham, et al.

8        Counsel, please make your appearances for the record.

9          MR. SQUIRES:  Your Honor, Randy Squires of Corr

10   Cronin for the plaintiff, and to my side is Jeff Willian of

11   Kirkland & Ellis.

12         MR. WILLIAN:  Good morning, Your Honor.

13         MR. FARIA:  John Faria of Kirkland & Ellis.

14         THE COURT:  Just a moment.  I have a seating chart

15   here, and I'm wishing to make sure it's right.

16       Next to you, Mr. Squire, is?

17         MR. WILLIAN:  Jeff Willian, W-i-l-l-i-a-n, as in

18   "Nancy."

19         MR. FARIA:  Jonathan Faria from Kirkland & Ellis.

20         MS. TSOUMAS:  Good morning, Your Honor.  Tammy

21   Tsoumas from Kirkland & Ellis as well.  I'm happy to spell

22   that for you.

23         THE COURT:  No, I have it.

24         MS. CANNER:  Your Honor, Heather Canner also from

25   Kirkland & Ellis.
```

1              THE COURT:  And who do you represent?

2              MS. TSOUMAS:  We all represent LVB-Ogden Marketing.

3              THE COURT:  Well, apparently the plaintiff is well

4     represented.  Good morning.

5          Let's see who's here from the defense.

6              MR. McGLOTHIN:  Good morning, Your Honor.  My name is

7     Dennis McGlothin from the Western Washington Law Group.  I

8     represent Henry Dean individually, Cicilia Elali

9     individually, and BGH Holdings.  To my left is Henry Dean; to

10    his left is R. Bruce Johnston; to his left is Nathan Arnold;

11    to his left is Scott Henrie; and to his left is Manish Borde.

12             THE COURT:  Do all of you represent all of the

13    defendants?

14             MR. McGLOTHIN:  No, Your Honor.

15             THE COURT:  So for the record, you need to tell me

16    who you represent.

17             MR. McGLOTHIN:  I represent Henry Dean individually,

18    Ms. Cicilia Elali individually, and BGH Holdings, LLC.

19             THE COURT:  Okay.  Mr. Johnston, who do you

20    represent?

21             MR. JOHNSTON:  Your Honor, Mr. Arnold and I represent

22    David Bingham, Sharon Bingham, Christopher Bingham,

23    Christopher Bingham, Cherish Bingham, Kelly Bingham, Bingo

24    Investments, CCRB Enterprises.

25             THE COURT:  Is there anybody you don't represent

1    other than Mr. Dean?

2           MR. JOHNSTON:  I don't represent Ms. Park, HyTech

3    Power, Ms. Dean, the 2007 Trust, or BDH Holdings.

4       I represent the original defendants in the case, I guess,

5    would be the best way to say it.

6           THE COURT:  Let me just clarify.  You represent the

7    judgment creditors on the judgment?

8           MR. JOHNSTON:  That's correct.

9           THE COURT:  All right.

10          MR. HENRIE:  Scott Henrie, Williams Kastner.

11   Mr. Borde and I myself represent Henry Dean as the trustee of

12   the 2007 Sharon Bingham Trust.  We represent Park Place

13   Motors and High Tech Power, Inc.

14          THE COURT:  All right.  Well, good morning,

15   everybody.

16      This hearing was scheduled for today, to consider a motion

17   to dismiss the complaints and a motion for a preliminary

18   injunction, and as the lawyers know in connection with those

19   two matters, the parties have provided the court with a stack

20   of materials and documents and declarations that's probably a

21   foot and a half high, and the court has reviewed them and was

22   and is prepared to hear oral argument on those two motions.

23      But we have an elephant in the courtroom.  That elephant

24   is called jurisdiction, and as a result of the court's recent

25   requests that the plaintiff provide additional information as

1    to who the plaintiff is and whether or not we have

2    jurisdiction, we have received plaintiff's -- first, we have

3    plaintiff's original corporate disclosure statement,

4    Docket 2, filed in February of this year.  Then we have

5    plaintiff's amended corporate disclosure statement filed on

6    April 26th of this year.  And, of course, the court then

7    asked for more information, and yesterday we received yet a

8    plaintiff's second amended corporate disclosure statement,

9    and we have attempted -- I'm not sure we've done a perfect

10   job on this -- to create a chart, which I've given you, to

11   try and understand who the plaintiff is, who are its owners,

12   and whether or not we have jurisdiction.

13        Here's where I am at the moment in connection with this

14   issue, and I'll hear from each side.  Basically, this case

15   was filed here alleging diversity, and I think it's clear

16   that the court needs absolute diversity in order to proceed

17   to have jurisdiction, except for the limited area of

18   ancillary jurisdiction to enforce a judgment.

19        The plaintiff's last disclosure statement is not yet

20   satisfactorily explaining whether we have jurisdiction --

21   diversity jurisdiction.  I think what it tells us is that we

22   do not have diversity jurisdiction.  The plaintiff can

23   respond in a moment.

24        But Docket 77, your latest disclosure, which you filed

25   yesterday, suggests that there are at least three problems

1   with diversity.  One is, you tell us that there are two

2   national persons who are invested in a limited partnership

3   who reside in Washington.  Then you tell us you have one

4   investor corporation with a principal place in Washington,

5   and you tell us that that amounts to 0.3 percent of the fund.

6       I think that would eliminate diversity jurisdiction.

7       The plaintiff also tells us that there are three remaining

8   members of Northwest LLC.  Northwest LLC is, apparently, the

9   owner of Corus Construction Venture, which is the owner of

10  plaintiff.

11      And with respect to these three remaining members of

12  Northwest LLC -- I guess the grandparent of the plaintiff --

13  what the plaintiff tell us is that they're subject to a

14  confidentiality agreement and we're not going to tell you who

15  the investors are.  That's, basically, what you're telling me

16  when you file this.

17      Mr. Squires, you signed this complaint.  I don't think you

18  have diversity, and your submission yesterday suggests that I

19  don't have diversity.  If I don't have diversity, I

20  believe -- and, again, we've been doing research last night

21  and this morning, but I think the rule is that I would not

22  have anything but ancillary jurisdiction, and the ancillary

23  jurisdiction would only relate to the judgment.  It can only

24  relate to the judgment debtors.  It could not pick up

25  Mr. Dean, for example, who is not a judgment debtor.  And it

1    would be limited -- and I refer you to a case, which I think

2    we've handed out to you, hopefully -- oh, we didn't.  We're

3    going to hand it out to you right now.

4        This is a Second Circuit case.  It's unfortunate that we

5    have to do a little of this ad hoc and without your having

6    the benefit of study, but the plaintiff has caused this

7    problem.  But *Epperson*, Second Circuit case, 242 F.3d 100,

8    deals with this issue.

9        If you go to page 4 of the handout, at the bottom of the

10   left side, it says, "The court also notes that it never has

11   authorized exercise of ancillary jurisdiction in a subsequent

12   lawsuit to impose an obligation to pay an existing federal

13   judgment on a person not already liable for that judgment,"

14   citing, I think, the *Peacock* case, which is a Supreme Court

15   case.

16       And then down at Headnote 12, "*Peacock* does not hold that

17   fraudulent conveyance claims brought in a subsequent action

18   require independent jurisdiction."  The court refused to

19   characterize the lawsuit as a fraudulent conveyance.

20       And then if you go -- the bottom line is, I believe, under

21   this case and under the *Peacock* case and the Supreme Court

22   juris prudence, I need complete diversity.  I do not believe

23   I have complete diversity.  I think I must dismiss all of the

24   lawsuit, except, perhaps, treat it under ancillary

25   jurisdiction against the original judgment debtors, and

1    solely for the purpose of attacking the trust, which I think

2    they're entitled to do, in an effort to enforce their

3    judgment.

4         So Mr. Squires, what do you think?

5              MR. SQUIRES:  Your Honor, I'm going to yield to

6    Mr. Willian on this.  I will say, just to set the table a

7    little bit, that the ownership structure of this entity is

8    one of the most complex I've ever seen.

9              THE COURT:  Well, but you signed this complaint.

10             MR. SQUIRES:  I did.

11             THE COURT:  Isn't it your obligation to explore

12   diversity before you allege it, sir?

13             MR. SQUIRES:  Well, it is.

14             THE COURT:  Well, and if you had done that, would you

15   not have found what you disclosed in the filing yesterday?

16             MR. SQUIRES:  I'm not sure, Your Honor.  It would

17   have taken -- your chart is useful and very accurate, as far

18   as it goes.  The actual ownership chart places these

19   investors at the seventh level above the --

20             THE COURT:  Does it matter?

21             MR. SQUIRES:  Well, Your Honor, I know what the Ninth

22   Circuit decision says, that -- that you're bound to follow.

23             THE COURT:  And which decision is that?

24             MR. SQUIRES:  That's Judge Fletcher's decision that

25   you cited to us when you asked us to come up with this

1   additional information.

2           THE COURT:  Well, this whole idea of an LLC and who

3   owns the LLC and whether it creates or allows us to have

4   diversity jurisdiction, but the law has been settled for many

5   years, that, for diversity, the LLC's members' citizenship is

6   what we have to look at.  Do you agree with that?

7           MR. SQUIRES:  I do agree with it.

8           THE COURT:  All right.  And you represent the LLC?

9           MR. SQUIRES:  I do.

10          THE COURT:  And so I think it's your obligation, as

11  the lawyer, to explore whether you have diversity.  You pled

12  diversity.

13          MR. SQUIRES:  Yes, we did.

14          THE COURT:  And you don't have diversity, do you?

15          MR. SQUIRES:  It does not appear that we do.

16          THE COURT:  And shouldn't I dismiss all aspects of

17  the case, other than your seeking a right to have a

18  declaratory judgment as part of your enforcement of a

19  judgment?

20          MR. SQUIRES:  I'll defer to Mr. Willian on this, Your

21  Honor.

22          THE COURT:  Mr. Willian is going to provide cover for

23  you?

24          MR. SQUIRES:  He's going to provide cover for me,

25  and, perhaps, represent me in this.

1          THE COURT:  Let me just explain to you.  I have

2    become keenly, keenly aware of this whole LLC diversity

3    problem because about a year ago I tried a case for a week

4    and a half involving LLCs.  And it went to judgment, jury

5    verdict.  It's on appeal.

6        Well, the first thing the Ninth Circuit does when they

7    take a look at an appeal is they look at the LLC and say,

8    wow, do we have jurisdiction?  They sent that case back to me

9    and said, "Judge, dig a little deeper.  Find out whether you

10   have jurisdiction.  We're digging."

11       But it alerted me, then, to this problem in your case.

12       All right.  Mr. Willian, what jurisdiction, if any, do I

13   have?

14          MR. WILLIAN:  You have the federal ancillary

15   jurisdiction, as you stated.  Your Honor, we agree with you

16   there is no diversity here, and this is information we

17   learned just a day or so ago.

18          THE COURT:  You learned it a day or so ago because I

19   pushed you --

20          MR. WILLIAN:  Absolutely.

21          THE COURT:  -- but this is something lawyers do when

22   they file complaints.  They allege diversity because they've

23   done an investigation.  What investigation did your firm do?

24          MR. WILLIAN:  We went three layers down, Your Honor.

25   We should have gone down to the seventh layer.  We had to go

1   outside of the holdings of our client to find this

2   information.  We apologize.  We agree that there is no

3   diversity jurisdiction.

4      I don't think 1332 is necessarily meant to bound to

5   diversity claim based on point-three percent ownership, but

6   it does.  There is no de minimis exception.  We agree with

7   Your Honor.  We take responsibility for that.  We agree there

8   is no diversity, and we apologize that we didn't catch that

9   sooner, and we thank the court for bring that to our

10  attention.

11     But we do have federal ancillary jurisdiction.  We've

12  prepared a three-page bench memo last night, and we've given

13  it to defendants, which we believe articulates the relevant

14  legal standard and how far you can go in this case.

15          THE COURT:  Are you going to share it with me?

16          MR. WILLIAN:  I would love to, Your Honor.

17          THE COURT:  Well, usually when you prepare something,

18  you file it electronically, and we look at it.  Have you done

19  that?

20          MR. WILLIAN:  No, sir, we have not.  We just finished

21  it this morning, and didn't know whether you'd accept it, and

22  we wanted to, at least, ask your permission before we brought

23  it to your attention.

24          THE COURT:  Hand it up.

25     Let me ask you this, counsel:  Do you need a separate

1    lawsuit in order to attack the trust in the sense of asking,

2    in an ancillary proceeding, to enforce your judgment against

3    the beneficiaries of the trust and the other defendants?  In

4    other words, couldn't you do that without filing a separate

5    lawsuit?

6            MR. WILLIAN:  I don't believe so under these

7    circumstances.  As this bench memo makes clear, citing the

8    *Peacock* case, quote, You have the jurisdiction to -- you can

9    exercise jurisdiction over a broad range of supplementary

10   proceedings involving third parties to assist in the

11   protection and enforcement of federal judgment.  So it refers

12   to involving third parties, including attachment, mandamus,

13   garnishment, and the prejudgment avoidance of fraudulent

14   conveyance.  That's *Peacock* at 356.

15       And that's precisely what Count 1 and Count 2 of the

16   complaint seek to do.  Count 2 is for fraudulent conveyance.

17   Count 1 is a declaratory judgment that we have the right to

18   attach and to garnish certain assets.

19           THE COURT:  So let's just look at your complaint.

20       You would agree that if there is no diversity

21   jurisdiction, some of the defendants that you have sued must

22   be dismissed?  Do you agree with that?

23           MR. WILLIAN:  We agree that Cicilia Elali should be

24   dismissed, and that's the only actual defendant that should

25   be dismissed.

```
 1            THE COURT:  Well, you've sued Mr. Dean individually.
 2    He was not -- he is not a judgment debtor.
 3            MR. WILLIAN:  That's correct, Your Honor, but he is a
 4    third party who holds assets of the judgment debtor that
 5    we're entitled to attach.
 6            THE COURT:  Well, but you can sue him as a trustee,
 7    perhaps, but you can't sue him individually, can you?
 8            MR. WILLIAN:  Yes, sir.  We believe that we can sue
 9    third parties individually who have assets of the judgment
10    debtor, and that's, basically, the authority that I just read
11    to you from Peacock, which says, again, that you can exercise
12    jurisdiction of a broad range of supplementary proceedings
13    involving third parties to assist in the protection and
14    enforcement of federal judgments, including attachments,
15    mandamus, garnishment, and the prejudgment of avoidance of
16    fraudulent conveyances.  And that's precisely what Count 2
17    covers, that's precisely what Count 3 covers of our
18    complaint.
19            THE COURT:  What about BGH Holdings, LLC?  Do you
20    have a judgment against them?
21            MR. WILLIAN:  No, sir, we don't, but they have -- as
22    Ms. Tsoumas will show you and demonstrate, and as the
23    evidence demonstrates, they have assets of the judgment
24    debtors, and, therefore, we have a right to attach that.
25            THE COURT:  All right.  Go ahead.
```

```
 1          MR. WILLIAN:  So we agree that the fraud count, which

 2    is Count 4, and the conspiracy count, Count 5 of the

 3    complaint, should be dismissed.  We don't intend to proceed

 4    on those actions -- causes of actions in front of you as a

 5    result of the lack of diversity jurisdiction.

 6       But, plainly, Count 1, which seeks declaratory judgment,

 7    that we can attach various assets of the judgment debtors and

 8    of certain third parties, should proceed, and certainly

 9    Count 2 should proceed, which strictly sounds of fraudulent

10    transfers.

11       And that Peacock quote I gave you, the court clearly

12    recognizes that you have the right to -- based on your

13    jurisdiction, to hear fraudulent transfer claims to enforce a

14    judgment.

15          THE COURT:  How about your third claim dealing with

16    alter ego and corporate veil piercing?

17          MR. WILLIAN:  That one is a little bit more muddy, I

18    should say.  We don't think it's necessary to dismiss it at

19    the moment.  But, importantly, Your Honor, for purposes of

20    this hearing, the motion only is a motion to enforce -- or

21    for a preliminary injunction regarding Counts 1 and 2.

22          THE COURT:  Well, wait a minute.  This hearing

23    involves two motions; one is a motion to dismiss the entire

24    complaint.

25          MR. WILLIAN:  Understood.
```

1            THE COURT:  So alter ego -- Claim 3 is on the table.

2    What is your position?

3            MR. WILLIAN:  Our position is that Count 3 should

4    stay for now; that there's authority that suggests that, for

5    example, if a third party, like -- let me just give you an

6    example -- CCRB Enterprises, that's a defendant, and as we've

7    demonstrated and will demonstrate today, that is the alter

8    ego of a judgment debtor.  It was even set up for,

9    essentially, fraudulent purposes, to receive fraudulent

10   transfers.  Therefore, based -- an alter-ego theory, that

11   that is a fictitious third party, and we're allowed to attach

12   the assets of that company on that basis.

13       Also, obviously --

14            THE COURT:  Just a moment.  Just a moment, counsel.

15       Sorry.  I missed a couple of words, and I was hoping to

16   pick it up on the realtime, but it's not working.

17            MR. WILLIAN:  I was giving you an example of how veil

18   piercing is within your jurisdiction.  I was trying give you

19   an example of a defendant, CCRB Enterprises, LLC.  We'll

20   demonstrate that that was set up for fictitious purposes,

21   basically hiding the assets of the judgment debtor, and,

22   therefore -- we have several theories to allow you to attach

23   the assets of that company, but they would include veil

24   piercing.  We say we're allowed to attach it.  They say, no,

25   it is a legitimate company as a defense.  Our response is, it

1   is not legitimate.  It is the alter ego of the judgment

2   debtor.

3        So it is not a new theory of liability.  Rather, it is

4   piercing a defense that they have raised; that it's a

5   legitimate company that is a non-judgment debtor.

6        So as the bench memo demonstrates, Your Honor, and I can

7   walk you through it in even more detail.  But we go through

8   each paragraph of our first cause of action, which is a

9   declaration of why we can attach certain assets.  We tie it

10  directly to the case law.

11            THE COURT:  What are you referring to now?

12            MR. WILLIAN:  To the bench memo that I've given you.

13            THE COURT:  This pleading you've just filed?

14            MR. WILLIAN:  Yes, sir.

15            THE COURT:  When did you give it to the defense?

16            MR. WILLIAN:  As soon as I walked in the door, Your

17  Honor.

18            THE COURT:  This morning?

19            MR. WILLIAN:  Yes, sir.

20            THE COURT:  When was it ready to be given to them?

21            MR. WILLIAN:  As soon as I got it this morning from

22  my team, I read it, put it in my bag, and walked over here,

23  Your Honor.  They worked on it last night, Your Honor.

24            THE COURT:  All right.  Go ahead.

25            MR. WILLIAN:  So as the case law indicates, the

1    second cause of action is for fraudulent transfer.  We're

2    going to demonstrate to you that the vast majority of what

3    we're asking you to attach today, or freeze, rather, is a

4    fraudulent transfer.

5         The case law is very clear from *Peacock* that you have the

6    right to hear, and, actually, have the unflagging obligation,

7    since you're jurisdiction, to hear fraudulent transfer claims

8    to enforce a federal judgment.

9         With respect to the first cause of action, we break it

10   down, and we seek a declaration that the plaintiff is

11   entitled to seize the assets in the Sharon Graham Bingham

12   2007 Trust, for which Sharon Bingham is a beneficiary.

13   That's Complaint Paragraphs 95A through C.  And it's our

14   belief the trust is holding millions of dollars of the

15   debtors' assets, which would be attachable but for their

16   claim that the trust has spendthrift protection.  That's

17   their defense.

18        We believe that the trust is not entitled to that

19   spendthrift protection; that that is not a real defense; that

20   you should hear the evidence and rule it's not entitled to

21   spendthrift protection.  That's squarely within your

22   authority.  That's Complaint Paragraphs 95A through C, the

23   first cause of action.

24        In addition --

25             THE COURT:  I think I understand your position.  Let

1  me from hear the defense on the diversity and jurisdictional

2  matters.

3         MR. McGLOTHIN:  Good morning, Your Honor.  Dennis

4  McGlothin from the Western Washington Law Group, and I

5  represent Henry Dean individually, Cicilia Park individually,

6  and BGH Holdings.

7      As stated in Mr. Dean's declaration, he is a member of the

8  Washington State Bar Association for the past 50 years, a

9  captain in the Marine Corps, and a veteran of the United

10 States Armed Forces.

11     It is a shame that these kind of complaints get filed

12 without a subject matter jurisdictional analysis by the

13 plaintiff alleging the acts of Mr. Dean.

14     Besides that, I believe that the ancillary jurisdiction

15 argument has some problems.

16     First of all, I'd like to say that the argument that

17 Mr. Willian just made regarding piercing the corporate veil

18 as an alter ego are either -- they're disingenuous, and it's

19 either from him not reading the cases he cites, or

20 misrepresenting them to you.

21     On page 106 of the opinion you just handed down for me to

22 read, which is on page 5 of your handout, the first full

23 paragraph talks about the Supreme Court *Peacock*.  It says,

24 "Since *Peacock*, most courts have continued to draw

25 distinction between postjudgment proceedings to collect an

1    existing judgment, and proceedings, such as claims of alter

2    ego liability and veil piercing that raise an independent

3    controversy with a new party in an effort to shift

4    liability."

5         So, clearly, the corporate veil piercing, alter ego,

6    disregarding corporate entity claims are not cognizable

7    without diversity jurisdiction.

8         We have this case out of the Ninth Circuit that the Second

9    Circuit has followed shortly after the *Peacock* decision, and

10   it's called *Thomas, Head*.  The *Thomas, Head* is a very, very

11   narrow read upon which ancillary jurisdiction rests.  By

12   definition, it has to be a supplemental proceeding.

13        They'd already commenced the supplemental proceeding,

14   which you've presided over for over a year now, seeking

15   subpoenas and documents from the trust.  That is their

16   vehicle to bring a third-party claim against only a

17   transferee who has assets that were formerly the judgment

18   debtors' in their current possession.  Because what they're

19   asking for is to say that is not your asset, that is the

20   debtor's asset, and then you can void that transfer and bring

21   that back over into the debtors' hands .  You cannot seek

22   monetary liability against the judgment debtors.  That's

23   where the line is drawn.

24        If you look at the cases on that same page that they

25   cited, not only the *Thomas, Head* case, but they say that you

1    can pursue under the ancillary jurisdiction of the court the

2    assets of the judgment debtor, even though the assets are

3    found in the hands of a third party.

4        Same with the *Security and Exchange Commissioner v. Antar*

5    case.  They have to be found in the hands of the relief

6    defendants.  And the *Merrill v. Miller* case:  "Plaintiff does

7    not allege that he should be able to satisfy his judgments by

8    reaching Ms. Deal's assets or Mr. Loger's assets; rather, he

9    alleges that the assets in question rightfully belong to the

10   judgment debtor."

11       So if the asset is no longer in existence in the

12   subsequent transferee's hands, and you're not seeking a

13   pulling back and give it back to the judgment debtors for

14   execution, then it doesn't fall within the *Thomas, Head*

15   exception.

16           THE COURT:  Well, you'll have a chance to brief the

17   issue.  Unfortunately, the issue has just recently arisen.

18       But what is your view on whether or not I have ancillary

19   jurisdiction to consider the declaratory judgment claims and

20   the fraudulent conveyance claims?

21           MR. McGLOTHIN:  Well, there's nothing in *Peacock* that

22   says declaratory judgment is one of the remedies that's

23   available in a postjudgment proceeding.  But to the extent

24   that they overlap with an action to try to recover an asset

25   in somebody's hands and bring it back in, I think that's a

1   distinction without a difference.

2       But I would like to point out, there is one big problem

3   with this case.

4       The *Thomas, Head* --

5           THE COURT:  There is just one?

6           MR. McGLOTHIN:  No, there is one big jurisdictional

7   problem that hasn't been addressed yet, and that is, this

8   judgment was issued by the Northern District of Illinois, and

9   the Seventh Circuit has a different analysis than the Ninth

10  Circuit and the Second Circuit.  They don't allow ancillary

11  jurisdiction for fraudulent conveyance actions.

12          THE COURT:  So that raises an interesting issue,

13  doesn't it, as to the ancillary proceeding, is here --

14          MR. McGLOTHIN:  Right.

15          THE COURT:  -- does Ninth Circuit law control, or

16  Seventh Circuit law?

17          MR. McGLOTHIN:  I don't think you can take an action

18  from the Seventh Circuit, bring an ancillary proceeding in a

19  different circuit, and gain rights.

20      As a matter of comity to the Seventh Circuit, I think that

21  would encourage forum shopping and would thwart many policies

22  that the federal case law --

23          THE COURT:  Well, what you're suggesting is that they

24  couldn't take their Seventh Circuit judgment and try and

25  enforce it in ancillary proceedings anywhere other than the

1   Seventh Circuit.  Or are you suggesting you could do that,

2   but it would be governed by Seventh Circuit law?

3            MR. McGLOTHIN:  I think it has to be governed by

4   Seventh Circuit law.

5            THE COURT:  And what do you think Seventh Circuit law

6   would say --

7            MR. McGLOTHIN:  I'll cite the case for you and your

8   clerk.  It's *Galuska*, G-a --

9            THE COURT:  Give us the cite.  I don't want the name.

10           MR. McGLOTHIN:  172 F.3d 53.

11           THE COURT:  And what do you think it says?

12           MR. McGLOTHIN:  Well, it says the district court's

13  jurisdiction over the first suit does not carry over to a

14  new, independent suit, even when a new suit is brought to

15  enforce a prior federal judgment.

16      And they're saying there is a bright line when that first

17  suit ends.  Ancillary jurisdiction is meant to really -- it

18  follows the *Peacock* analysis; that it's really meant to let

19  defendants bring their claims, if they're hailed into federal

20  court, so that those rights aren't lost.  And they say that

21  once jurisdiction ends in their case, then there is no more

22  ancillary jurisdiction at that point.  You're either left to

23  your state law remedies, or other collection remedies under

24  the Federal Rules of Civil Procedure.  That's just the way

25  the Seventh Circuit has interpreted it.

1          THE COURT:  Well, did you brief any of that in

2   connection with your motion to dismiss?

3          MR. McGLOTHIN:  I -- I just looked -- I did this in

4   response to what you sent me yesterday, and what they --

5   their second amended --

6          THE COURT:  Well --

7          MR. McGLOTHIN:  -- they weren't claiming ancillary

8   jurisdiction.

9          THE COURT:  They were claiming diversity

10  jurisdiction.  How did you answer to that?  Did you admit it?

11         MR. McGLOTHIN:  I -- I didn't -- we didn't answer

12  yet.  We filed a motion to dismiss.

13         THE COURT:  Well, I think -- don't you think that

14  this court, either in the first proceeding, which deals with

15  discovery and that aspect of the case, or this case,

16  somewhere doesn't this court have the jurisdiction to

17  consider these issues -- some of these issues?

18         MR. McGLOTHIN:  I definitely think the veil piercing,

19  disregarding the corporate entity, and alter ego theories are

20  outside what you can consider, given the *Efferson* case.

21         THE COURT:  Well, how about fraudulent conveyances?

22  How about the challenge to the trust, which goes to the heart

23  of the matter.  Is this a spendthrift trust that is or is not

24  subject to creditor attack?

25         MR. McGLOTHIN:  Well, what you're trying to do is

```
 1   make the spendthrift -- if they were seeking to avoid the

 2   transfers that were still in the hands of the spendthrift

 3   trust, then if they brought a supplemental proceeding for

 4   that, then, perhaps, you can go after that, with that

 5   exception I made of the divisions between the two circuits,

 6   the circuit of the rendering court of the judgment and this

 7   circuit.  Subject to that, I think the Thomas, Head case

 8   allows for a supplemental proceeding to do that.

 9           THE COURT:  Well, isn't that really what's happening

10   here?

11           MR. McGLOTHIN:  This is really an independent action.

12   And if you look --

13           THE COURT:  It's certainly an independent action.

14           MR. McGLOTHIN:  It's not a supplemental proceeding.

15           THE COURT:  Well, in a supplemental proceeding, could

16   Mr. Dean be sued individually, if it's alleged that he has

17   received assets that came out of this trust?

18           MR. McGLOTHIN:  Only if they were still in his hands.

19           THE COURT:  Well, but, of course, we don't know

20   whether they're still in his hands.  But if they're in

21   someone else's hands that he caused to allow them to be

22   sent -- I mean, some of it was alimony payments, apparently,

23   that were made to his former wife.  Could they attack that?

24           MR. McGLOTHIN:  The way I read Thomas, Head and the

25   way I read the cases and this Efferson case, the asset still
```

1    has to be in the hands of the relief defendants or the

2    fraudulent transferee.

3            THE COURT:  So if one transferee received the asset,

4    and then the next day sent it to the second transferee,

5    you're telling me that they couldn't chase the second

6    transferee?

7            MR. McGLOTHIN:  Oh, they can chase the second

8    transferee.

9            THE COURT:  How about the third transferee?

10           MR. McGLOTHIN:  They can chase the third transferee.

11           THE COURT:  So it doesn't have to be in the hands of

12   the original transferee?

13           MR. McGLOTHIN:  But what they can't do is get a

14   monetary judgment against the first transferee.  That's what

15   I'm suggesting.  That's where you cross the line.

16           THE COURT:  I don't understand.  Let's assume we're

17   talking about -- let's just pick a number -- $50,000.

18   Mr. Dean, as trustee, transfers $50,000 from the trust to his

19   former wife, who then transfers it to my law clerk.  He needs

20   an upgrade in his salary.  Can they not -- can't the

21   plaintiff go after and get that $50,000 back from my law

22   clerk?

23           MR. McGLOTHIN:  Yes, if -- but what they can't do is

24   get a $50,000 monetary judgment against Mr. Dean or his

25   ex-wife, who made the transfer, because then you're imposing

1    monetary liability on them as opposed to trying to bring back

2    an asset.

3        And that's a good point, because cash is really hard in

4    these circumstances to clearly trace, specify, and say that

5    that cash is the cash that was fraudulently transferred, et

6    cetera.  And all the allegations in their response to their

7    motion to dismiss, the appendix which should have been part

8    of the complaint in the first instance, are all transfers of

9    cash.

10            THE COURT:  Well, we have a lot of issues to discuss

11   this morning and a lot of expensive lawyers that have come

12   from out of town to participate.  Here's what I'm going to

13   do.  I think we should take advantage of the lawyers being

14   here and the issues that you have briefed up.

15       I think it's clear, and I am going to rule, that I don't

16   have diversity jurisdiction, for the reasons that we have

17   discussed and for the reasons set forth in *Efferson v.*

18   *Entertainment Express,* which is the Second Circuit case that

19   we've been talking about, and the *Peacock* case from the

20   Supreme Court, and I'm going to dismiss without prejudice the

21   plaintiff's complaint as it relates in all respects to the

22   one defendant, Cicilia Elali, formerly Cicilia Park.

23       I'm going to dismiss, again without prejudice, Mr. Dean in

24   his individually capacity.  I think that the issues need to

25   be reframed.

1        I'm going to dismiss the fourth cause of action for fraud

2    against all defendants, a civil conspiracy complaint against

3    all defendants, for lack of jurisdiction.

4        I'm unclear on the alter-ego issue.  I believe it may be

5    something that can be raised in an ancillary proceeding.  So

6    I'm -- so what I'm going to do is order the plaintiff to file

7    an amended complaint, within 20 days, that narrows the issues

8    and relies solely on ancillary judgment.

9        If the plaintiff wishes to proceed forward in this case, I

10   think, frankly, what ought to happen is that whatever issues

11   are being litigated, in terms of trying to collect the assets

12   of the trust or others, there ought to be a truly ancillary

13   proceeding in the other case.  And I think we can accomplish

14   everything that we need to do in that case, and we could

15   dismiss this case entirely.

16       But because the briefing has -- and jurisdiction has kind

17   of erupted on the court in the last, literally, 24 hours, I'm

18   not prepared to do that yet, but I would encourage the

19   plaintiff to consider the vehicle in which it wishes to

20   proceed in order to try and challenge the issues that would

21   remain.

22       I do believe that the plaintiff, in an ancillary

23   jurisdiction, the court would have authority to consider

24   whether there were -- whether the trust is or is not a valid

25   spendthrift trust, and whether or not there were or were not

1    fraudulent transfers.

2        Of course, there is a huge statute of limitations issue on

3    the merits as a defense, which has been briefed but which

4    cannot be today resolved.

5        And I am quite concerned with many of the allegations

6    contained, frankly, in the existing complaint as it relates

7    to, particularly, the fraudulent -- alleged fraudulent

8    representation of Mr. Dean, given all of the information

9    which Mr. Dean and others provided to the plaintiff and

10   plaintiff representatives years ago.

11       But for the record, the motion to dismiss -- I don't have

12   the docket number, but it's -- that motion will be granted in

13   part and denied in part for the reasons stated on the record.

14       And the plaintiff is directed, within 20 days, to file an

15   amended complaint, should the plaintiff wish to pursue the

16   matter strictly on an ancillary proceeding basis.

17       So I think that brings us, then, to the preliminary

18   injunction motion.  I mean, I don't see any -- well, I guess

19   you have got a motion to dismiss the first two claims as

20   well.  Do you wish to have argument on that?

21           MR. McGLOTHIN:  Yes, Your Honor.  At least -- I would

22   argue, at least, as to the Voidable Transactions Act claim.

23           THE COURT:  All right.  Well, any questions on the

24   court's ruling so far?

25           MR. WILLIAN:  No, Your Honor.

1           THE COURT:  All right.  So with respect to the motion

2    to dismiss, essentially, the Cause of Action 2, I'll hear

3    brief oral argument on that.

4           MR. McGLOTHIN:  Your Honor, the Uniform Voidable

5    Transactions Act claim relies primarily, from what I can see,

6    on actual fraud claim basis, even if it is a constructive

7    fraud claim basis, which they say they're pleading in the

8    alternative, it has to meet the heightened pleadings

9    requirement of Federal Rule of Civil Procedure 9, and it just

10   really does not rise to that level.

11          It doesn't identify, at least in the complaint, the

12   transactions that were allegedly fraudulent.  It doesn't do

13   it by date and time so that you can make an informed

14   decision.

15          They try to supplement that in their response as an

16   appendix to their response to the motion to dismiss, and it

17   really has to be in the four corners of the complaint.  And

18   once they do that, then we could bring a subsequent motion to

19   dismiss as to certain of those actions, and limit discovery,

20   et cetera.

21          So that cause of action needs to be dismissed without

22   prejudice, and have them replead it, putting forth the actual

23   transactions, when they occurred, what the transactions were.

24   Basically, if they're going to rely on that chart, put that

25   in there so we can test the sufficiency of the pleading once

1   it's properly put into a pleading.

2       The other thing they have --

3           THE COURT:  They do allege and outline in the

4   complaint a variety of transactions.  They actually have

5   charts.  I refer you to paragraph 48, just for example, the

6   outlining the 495,000 checks written to CCRB, which is an

7   entity that is owned by, I guess, the grandparent -- the

8   grandchildren and the great-grandchildren of the Binghams.

9   They were Binghams' children and grandchildren, I guess, is

10  what they are.

11      But on page 12 of the complaint, they list each

12  transaction, the date, where it came from, the trust, the

13  amount.

14      Let's take the first one, $146,000 for a Hunts Point

15  contract fee, and then there are all of these payments

16  regarding the improvements to the swimming pool, apparently,

17  of the family, Chris Bingham's home.

18      What more do you need?

19          MR. McGLOTHIN:  If those were the only transfers that

20  they were seeking to void, then I think that would be

21  sufficient, but --

22          THE COURT:  Well, but do you agree with me that those

23  transactions -- the pleading is sufficient under the rule?

24          MR. McGLOTHIN:  But I think they should do that for

25  all the transactions that they're seeking.

1      THE COURT:  All right.  Well, then, but the problem

2   is that once you have conceded that some of these allegations

3   are sufficient, then don't I have to deny the motion to

4   dismiss the claim, and you can sort it out in summary

5   judgment fashion?

6      MR. McGLOTHIN:  Well, as to cash payments, you know,

7   I -- the other -- I would have no problem as to cash

8   payments, I guess.  But --

9      THE COURT:  But you're moving to dismiss those in its

10  entirety, and I'm telling you -- I'm asking you, really, if

11  some of the transactions are pled with sufficient detail to

12  pass muster with Rule 9, then don't I have to say the

13  complaint stands, and you can sort it out later?

14     MR. McGLOTHIN:  If the plaintiff is limiting itself

15  to those transactions, yes, or they'd have to amend the

16  complaint at some further date to allege further

17  transactions.  And that's what I'm trying --

18     THE COURT:  Well, let's go to HyTech Power.  That's

19  another one of the transactions you don't like.  You know,

20  there were a lot of transactions that -- and again I'm

21  referring you to page 15 of the complaint, paragraph 61.

22     They allege that on 6/23 of 2016, $100,000 was sent from

23  the trust to HyTech Power.  Isn't that pretty specific?

24     MR. McGLOTHIN:  It is, but what isn't specific is

25  what was the consideration received and what was it for, was

1   it a loan that was repaid, et cetera.  There was $100,000

2   transferred to a company for an investment.  I mean, you

3   know, I'm -- I -- I just -- what I'm trying to say is I don't

4   see that transfer, standing alone, without the intent to

5   defraud element being put in there, the who, what, where,

6   when, why and how, you know, as being sufficient, no.

7           THE COURT:  All right.

8           MR. McGLOTHIN:  And as to the transfers that they

9   allege to CCRB and to others, and some of them are from the

10  trust back to the judgment debtor, how could those possibly

11  be fraudulent if you're taking assets out of the trust and

12  transferring it back to the judgment debtor?  That makes it

13  available for execution.  How could that possibly be

14  fraudulent?

15          THE COURT:  Well --

16          MR. McGLOTHIN:  That's what they're alleging.

17          THE COURT:  All right.  So your position is that they

18  have not alleged sufficient facts.

19      Does the Cause of Action 2, even in an ancillary kind of

20  jurisdiction claim, require the same type of specificity that

21  an independent fraud claim would require?

22          MR. McGLOTHIN:  I believe it does.  There's case law

23  out of the Ninth Circuit that says that the actual fraudulent

24  transfer claims do require the heightened pleading

25  requirement, and also constructive fraud claims have a

1    constructive -- have the heightened pleading requirement.

2        The other thing that we're trying to make sure we get a

3    dismissal, even a dismissal with prejudice, is that any

4    constructive fraud claim doesn't survive if it was more than

5    four years prior to the filing of the complaint.

6            THE COURT:  Isn't that a summary judgment type of --

7    it always is -- where does the -- if they've alleged it and

8    they alleged they didn't know about it, doesn't that get them

9    past the motion to dismiss?

10           MR. McGLOTHIN:  Only on the actual fraud claim.

11   That's got the discovery rule.  The constructive fraud claim

12   has no discovery rule, and neither does the insider

13   preference claim have a discovery rule, and that's one year

14   after the transfer period.

15           THE COURT:  Can you bring in an ancillary proceeding

16   in a constructive fraud claim?

17           MR. McGLOTHIN:  I don't believe you can.

18           THE COURT:  I guess that's all going to get sorted

19   out, isn't it?

20       All right.  I think I understand your position.

21           MR. JOHNSTON:  Your Honor, may I address a couple of

22   issues for a moment?

23           THE COURT:  Yes, in just a moment.

24       We're going to take a short break to get our electronics

25   working, and then I want to go to the preliminary injunction

1   issue.

2          MR. JOHNSTON:  It is my intent to just simply address

3   the question you asked about a moment ago.

4          THE COURT:  Okay.  We'll be in recess.

5          (Court in recess 10:04 a.m. to 10:20 a.m.)

6          THE COURT:  All right.  Counsel, you may continue.

7          MR. JOHNSTON:  Thank you, Your Honor.

8      I want to start by pointing out, I think there is a lack

9   of analytical precision between the federal cases talking

10  about fraudulent transfers and the Washington Uniform

11  Fraudulent Transfer Act, which is really broader.

12     In all of the federal cases, you will see things like,

13  well, he took $25 million, and he left.  There are no trusts,

14  there are no issues like that.

15     So the first question that comes up is, is a court of

16  general jurisdiction -- with general jurisdiction required to

17  hear the fullness of an action under the Washington act?  I

18  submit that it is, and that ancillary jurisdiction and

19  research, and we'd asked for additional briefing, will

20  disclose that difference.

21     But in terms of our motion to dismiss the complaint, Your

22  Honor, we moved on that without respect -- in -- in respect

23  to the second cause of action and, indeed, the first without

24  reference to the jurisdictional issue, and I simply want to

25  address that motion to dismiss.

1      The complaint, although it's 95 paragraphs or something of

2  that nature, is prolix, it's confusing, and it omits

3  essential elements of any cause of action under the

4  Washington act, which would be more strict than what I think

5  the federal statute under ancillary jurisdiction would be.

6      Now, what does it omit?  Number one --

7           THE COURT:  So what law -- if we have only ancillary

8  jurisdiction, is it going to be federal law or state law?

9           MR. JOHNSTON:  Your Honor, I think that the issue of

10  what ancillary jurisdiction covers is exactly what

11  Mr. McGothlin indicated, and that is an actual conveyance of

12  property of the debtor that can be shown to be property of

13  the debtor in the hands of a third party.

14      The constructive claims and those kinds of things

15  regarding trust, by the way, are subject to counterclaims

16  under state law; pursuit of trust assets improperly creates a

17  cause of action.  It is a matter that, frankly, just has to

18  be in state court, and should be.  And, indeed, that --

19           THE COURT:  Well, I wish it was, but it's not --

20           MR. JOHNSTON:  Well, Your Honor --

21           THE COURT:  And if it is only ancillary jurisdiction

22  that I enforce, I don't think any counterclaims can be

23  brought.  If you want to sue the plaintiff, I think that

24  you'll have to go to state court or go to Illinois or go

25  someplace.

1              MR. JOHNSTON:  Well, the problem is, Your Honor, I

2     think that we need to look very carefully at the boundaries

3     of the court's ancillary jurisdiction, unless we go down the

4     same kind of a path that you described in the other case.

5          And I want to say that, in terms of their pleading, even

6     if there were jurisdiction, Your Honor, number one, the

7     Fraudulent Transfer Act defines specifically a transfer, and

8     it says it must be a transfer from a debtor to a third

9     person.

10         All of the matters that you discussed relating to HyTech,

11    relating to the swimming pool, relating to all those things,

12    have nothing to do and cannot constitute a fraudulent

13    conveyance.

14         Unless they can show -- and they've admitted this trust

15    was valid in its inception, there were $10 million put into

16    it, as indicated in Mr. Dean's declaration, and they didn't

17    acknowledge to the court that is was valid at its inception.

18         So they have to show that there was a transfer into the

19    trust that was in violation of a provision -- and the best

20    case -- a violation of some provision of the Fraudulent

21    Conveyance Act.

22         And, Your Honor, you have to take the facts of the

23    pleadings in the complaint as true if they are well pled and

24    if they are complete.  In this case, they are neither well

25    pled nor complete.

1          I defy them to find one specific transfer of money or of

2     value into the trust by a debtor within four years of the

3     complaint.

4          Now, Your Honor mentioned the statute of limitations.

5     It's very interesting.  The statute of limitations can be the

6     subject of a motion to dismiss if adequate information is not

7     pled.

8          And it is very interesting.  I did a little research on

9     what Kirkland & Ellis, the particular lawyers in this

10    courtroom, have said about the discovery rule.  In a pleading

11    in a case where they were representing Boeing, Ms. Tsoumas

12    and Mr. Faria said, "Indeed, a plaintiff who doesn't allege

13    that she was injured within the statute of limitations period

14    but instead invokes the discovery rule concedes, by

15    implication, that without the discovery rule, the claims are

16    barred."

17         Now, there are no claims of transfers into the trust

18    identified according to Rule 9 in this complaint within four

19    years of the filing of the complaint.  They go to the

20    discovery rule by throwing all of this nonsense at Mr. Dean

21    and say, well, he lied and we were mistaken.

22         Well, Your Honor, there is a necessary element to that,

23    and that is they had to rely and they had to reasonably rely

24    on it, and they have to plead that.

25         Now, a corporation or an LLC --

1          THE COURT:  They did plead it.

2          MR. JOHNSTON:  No, they didn't.

3          THE COURT:  They pled reasonable reliance, did they

4     not?

5          MR. JOHNSTON:  They stated a conclusion that there

6     was reasonable reliance, but that is not the pleading of a

7     fact, and it is not adequate.

8          And they to say a corporation can only -- and an LLC --

9     can only act through its officers.  And the only officers

10    that were available or possible to have relied and to have

11    reasonably relied, and I can -- you can -- in a motion to

12    dismiss, you can look at the attachments to the complaint,

13    and they put in Mr. Weiss's emails and they put in that kind

14    of information -- I don't have to go to Mr. Dean's

15    declaration on the details of that to know that it was Weiss

16    and that Weiss was a lawyer and that Weiss was an

17    inexperienced lawyer.  There's no question about that.

18         Now, the only person or persons that could rely would be

19    Weiss or someone that Weiss talked to, because that's where

20    the information or saw the information.

21         So they need to plead who it was within LVB who relied and

22    how possibly it could have been reasonable under the

23    circumstances, and they do not plead any of those facts, not

24    one of them.  And, as a consequence, the claim is defective

25    in that they have conceded that their claims, at least those

1   beyond four years, and there are no transfers by the debtors

2   in to them pled with any specificity before that, they have

3   to plead something within that time or outside that time, and

4   if they plead outside the time, they've admitted that they

5   have to have had that reliance they needed to plead the

6   facts; that an experienced lawyer, having been told and been

7   given settlement agreements, documents which indicate there

8   was a challenge to the trust by Umpqua Bank, knowledge that

9   there were four experienced lawyers, the hyper-diligent Dan

10  Brown that all of us know here in Washington, Rick Schroeder

11  at Davis Wright gets a judgment and goes after it, Washington

12  Trust Bank goes after it.  They knew those things, and so --

13          THE COURT:  I think your arguments mostly relate to

14  the fraud claim and other claims that the court has dismissed

15  as opposed to the fraudulent conveyance.

16          MR. JOHNSTON:  I'm only addressing the fraudulent

17  conveyance in that -- in that all of the transfers took place

18  more than four years, any transfer that they've identified in

19  any detail.  Of course, all of those are all explainable for

20  reasons that would go to summary judgment.

21      But that's all they've alleged with any specificity.  And

22  what it means is, for those to be compensable or even

23  actionable under the fraudulent conveyances of the statute,

24  they have to have pled why the statute of limitations doesn't

25  apply, and they did not do so and they cannot do so, Your

1    Honor, because, under the circumstances, they would have had

2    to supply a statement that Mr. Weiss, an inexperienced

3    lawyer, was misled by this, and they can't do it.

4          THE COURT:  All right.  I think I understand your

5    position.

6          MR. JOHNSTON:  So, again, I just think if there is an

7    allowed amendment, Your Honor, it should be to that claim and

8    its deficiencies as well.

9       Thank you, Your Honor.

10         THE COURT:  Thank you.

11      All right.  Let's hear from --

12         MR. HENRIE:  Your Honor, I just want to say

13   quickly --

14         THE COURT:  All right.  I don't know who you are,

15   so --

16         MR. HENRIE:  Scott Henrie from Williams Kastner.  I

17   represent Mr. Dean as trustee.  I represent HyTech and Park

18   Place.  You earlier asked questions about HyTech, and I

19   didn't get to answer them, but I don't need to today.

20      In light of your ruling, I think that the motion to

21   dismiss probably should be made when we do have an actual

22   complaint.

23      So, Your Honor, I just want to make sure I haven't waived

24   anything by not getting up and saying we'll deal with it when

25   they actually file it.

 1              THE COURT:  All right.  Thank you.

 2        All right.  Let's hear from the plaintiff.

 3              MS. TSOUMAS:  Good morning, Your Honor.  Tammy

 4     Tsoumas on behalf of the plaintiff.  I just want to briefly

 5     address -- and I'm happy to address any other questions the

 6     court has with respect to the defendants' motion to dismiss,

 7     but I'll address the arguments that were raised in order, and

 8     if Your Honor has further questions, let me know.

 9        Mr. McGothlin first raised the argument that plaintiff

10     somehow doesn't identify the transfers in the complaint.

11        I think Your Honor pointed to the right paragraphs in the

12     complaint, but for the avoidance of doubt, we clearly

13     identified the when, the what and the from and the to.  And

14     so, for example --

15              THE COURT:  Well, what have you alleged in the last

16     four years?

17              MS. TSOUMAS:  So, Your Honor, at Document

18     Docket No. 59, starting on page 41 --

19              THE COURT:  I'm sorry.  What is 59?

20              MS. TSOUMAS:  In our opposition to the motions to

21     dismiss, we attached a chart.  So this is Docket No. 59.  I

22     have an additional copy, if Your Honor would like it.

23              THE COURT:  I have it someplace.  This is in

24     connection with your motion to dismiss?

25              MS. TSOUMAS:  Our opposition, Your Honor.

```
 1              THE COURT:  All right.

 2        All right.  I have it.

 3              MS. TSOUMAS:  In this chart, Your Honor --

 4              THE COURT:  What page are we looking at?

 5              MS. TSOUMAS:  Forty-one.

 6              THE COURT:  I'm sorry.  Paragraph 41?

 7              MS. TSOUMAS:  No.  It's attached to our opposition

 8     brief.  Would you like another copy?

 9              THE COURT:  I just need one with the exhibits.

10        All right.  The appendix, is that what we're looking at?

11              MS. TSOUMAS:  Yes, Your Honor.

12              THE COURT:  All right.  I have it.  Go ahead.

13              MS. TSOUMAS:  Within this appendix, Appendix A, we

14     allege 54 different transfers.

15        We've heard the defendants make quite a bit about the

16     statute of limitations.  Your Honor, only 13 of the 54 listed

17     on here are beyond the statute of limitations for which LVB

18     would have to invoke the discovery rule.

19        Here, as defendants raised in their motion to dismiss,

20     they've alleged that we didn't allege with specificity.  So

21     for the avoidance of doubt, we attached this chart that

22     alleges date, from, to, the subject of the transfer, and then

23     we cite to our complaint.  And as Your Honor pointed out to

24     Mr. McGothlin, we include within our complaint several charts

25     detailing by date and amount and from and to.
```

1        So, Your Honor, if you have any more questions with

2    respect to that, I'm happy to answer them, but I think we

3    have sufficiently identified the transfers at issue.

4              THE COURT:  All right.

5              MS. TSOUMAS:  Mr. McGothlin also raises that many of

6    these transfers were transfers to judgment debtors.  Let's be

7    clear about what Mr. McGothlin is talking about.  I'm happy

8    to get into this in further detail.

9        But there are several transfers that eventually end up

10   with the debtors.  For example, several hundreds of thousands

11   including a $1.2 million so-called loan was transferred from

12   the trust to CCRB, then to Chris Bingham.  And so when

13   they're talking about transfers to debtors, they're talking

14   about largely transfers to debtors through these shell

15   corporations to, in our opinion, create the appearance of

16   legitimacy.  So these aren't transfers going directly to the

17   debtor such that LVB could garnish them.  They're going to

18   these holding companies that, without discovery, we weren't

19   able to determine were actually fake.

20       I'd like to turn to the other arguments that were made.

21       We've heard much about this transfer from a debtor

22   argument.  Your Honor, as you mentioned at the beginning of

23   this hearing, if money goes to Mr. Dean and then Mr. Dean

24   gives it to his former ex-wife [sic] and his former ex-wife

25   gives it to somebody else, that's a transfer of money from a

1    debtor.

2        Their argument is elevating form over substance, and the

3    Uniform Fraudulent Transfer Act does not allow that.  We

4    cited cases to Your Honor, including a case called *Aqua Chem*,

5    which specifically says that fraudulent transfer doctrine is

6    a flexible principle that looks to substance rather than form

7    and protects creditors from any transactions the debtor

8    engages in that have the effect of impairing their rights.

9        And what the defendants have stood here and said is that

10   because money was hidden in this trust and then transferred

11   from the trust, somehow that's not a transfer from the

12   debtor.  That is elevating form over substance and is

13   completely inconsistent with the Uniform Fraudulent Transfer

14   Act.

15       Your Honor, we've also heard quite a bit about the statute

16   of limitations.  As I indicated to you earlier, that's 13 --

17           THE COURT:  You made that point, counsel.

18           MS. TSOUMAS:  And as Your Honor mentioned, we do

19   allege that we reasonably relied on misleading statements.

20       So I'm happy to address any other questions.

21           THE COURT:  No, thank you.  I think I've heard enough

22   on fraudulent transfers.

23           MR. JOHNSTON:  Your Honor, may I make one 30-second

24   comment on the document that was discussed?

25           THE COURT:  Thirty seconds.  We'll count them.

1   Madame Clerk, start your watch.

2           MR. JOHNSTON:  Appendix A that was just looked at,

3   as -- it's on -- Document 59.  If you look at it, there are

4   only two transfers identified in that document that are from

5   a debtor to the trust or to any third party.  All the others

6   go the other way.  They were not within the Act.

7       And the one -- the first one is at the bottom of page 1, a

8   note from Francis Graham, and the complaint identifies that

9   that amount of money was spent on her house and she gave the

10  note, so there is no possibility that can be a claim.

11      The second one is on February 28th of 2014, a quitclaim

12  deed in a Sammamish house.  The Sammamish house, the public

13  records disclosed, is subject to $50- or $60 million worth of

14  liabilities ahead of LVB.  It could not have been a

15  fraudulent transfer.  There is nothing in here that

16  establishes any transfer within that time frame from a debtor

17  to the trust.  It is absent.

18      Thank you.

19          THE COURT:  All right.  Thank you.  I want to get to

20  the motion for preliminary injunction.

21      With respect to the Uniform Fraudulent Transfer Act, the

22  defendants argue that there has been a failure to state a

23  claim under Rule 12(b)(6).  I'm satisfied that a claim has

24  been stated.

25      The Uniform Fraudulent Transfer Act holds that fraudulent

1    transfers may be set aside if they're made with action or

2    attempt to hinder or delay.

3        The *Aqua Chemical, Inc.* case that was decided by Judge

4    Robart recently, in 2014, and a transfer is every mode of

5    transferring or disposing of an asset or interest.  And an

6    asset is, very broad, property of a debtor; property is

7    anything that may be subject to ownership.

8        In light of these expansive definitions, I think the

9    plaintiff has alleged sufficient facts to support the claim.

10       I also believe the complaint as to that claim meets the

11   applicable pleading standards of both Rule 8 and also the

12   Rule 9, which is the fraud claim statute.  It must state,

13   with particularity, the circumstances involving the fraud,

14   the intent and the like, and averments of fraud must be

15   accompanied by the who, what, when, where, and how, and the

16   plaintiffs have clearly indicated that.

17       This standard does apply to the fraudulent transfer

18   claims.  That was the ruling in *Aqua Chemical* and other

19   cases.

20       I'm satisfied that this claim does sufficiently allege

21   particularity.

22       They allege in the complaint who perpetrated the alleged

23   fraud, the complaint, at paragraphs 4 through 10 and 29

24   through 72, 99 through 105, when it occurred.  I'm not going

25   to list all of these paragraphs.  But it is where it

1    occurred, how it occurred, and I'm satisfied, to the extent

2    we have jurisdiction to consider the issue in an ancillary

3    way, that there is enough here to move on to the next type of

4    challenge to this claim.  This will be, presumably,

5    ultimately a summary judgment motion, where we'll have to

6    deal with the statute of limitations and the other issues.

7    But I think the claim is there.

8         So to the extent the motion is made to dismiss Count 2,

9    other than what I have indicated is going to be dismissed for

10   jurisdictional purposes, I believe I have ancillary

11   jurisdiction to consider it.

12        And I will still require that the plaintiff file an

13   amended complaint, and, hopefully, narrow the issues, or file

14   something -- and, perhaps, we can just consolidate this case

15   with the other proceedings.  We have one ancillary

16   proceeding.  But we need to look at that.

17        So I think we're ready to talk about the motion for

18   preliminary injunction, and that's brought by the plaintiffs,

19   so I'll hear from the plaintiff first.

20             MS. TSOUMAS:  Your Honor, we've prepared --

21             THE COURT:  You got all the heavy lifting, did you,

22   today?

23             MS. TSOUMAS:  Apparently, they gave it all to me.

24             THE COURT:  All right.

25             MS. TSOUMAS:  Your Honor, we prepared a presentation

1    of the evidence that's already in the record, and with your

2    permission, we'd like to display it.

3            THE COURT:  Has it been provided to the other side?

4            MS. TSOUMAS:  We do have copies.  It is just a

5    summary of the evidence that's already been provided, but

6    we're happy to provide copies right now as well.

7            THE COURT:  Okay.  Please do that.

8            MS. TSOUMAS:  Can you see your screen?

9            MR. JOHNSTON:  I'd like to see the hard copy.

10           MR. BORDE:  Your Honor, for the record, we were not

11   provided a copy in advance of this presentation.

12           MS. TSOUMAS:  Your Honor, LVB, as you know, has a

13   valid and enforceable judgment against the defendants for

14   over $70 million, but for years the defendants have

15   orchestrated a complex, fraudulent scheme to try to avoid

16   payment, all the while living a lavish, extravagant

17   lifestyle, which includes multimillion-dollar renovations of

18   their homes, and trips.

19       Very briefly, Your Honor, if you'll allow me to, I'd like

20   to explain this complex, fraudulent scheme, but, of course,

21   at any point you want to stop me, if you have any questions,

22   please feel free to do that.

23       Your Honor, this all began in 2009, when Chris Bingham

24   called Mr. Dean, who was currently living in Idaho, and told

25   him that the Binghams were having some problems, and they

1   needed Mr. Dean to come and help them come up with some

2   solutions.

3       Mr. Dean, as you know, came to Washington and took on that

4   job.  One of his first responsibilities or duties of what he

5   did when he came to help the Binghams in September of 2009,

6   he removed Sharon Bingham as the trustee of her own trust.

7   She'd been a trustee --

8           THE COURT:  Let's get the facts straight, counsel.

9   Ms. Bingham signed a document that -- resigned as trustee and

10  appointed Mr. Dean.  Isn't that what happened?

11          MS. TSOUMAS:  That's correct.

12          THE COURT:  So do you concede -- does the plaintiff

13  concede that this was a spendthrift trust and that assets --

14  legitimate assets were put into the trust as of that time?

15          MS. TSOUMAS:  We concede that it was intended to be a

16  legitimate spendthrift trust at its inception.

17          THE COURT:  That wasn't my question.

18      Do you concede that it was a legitimate spendthrift trust

19  at the time Mr. Dean took over as trustee?

20          MS. TSOUMAS:  We concede that when a person like

21  Francis sets up a trust for her daughter -- for the benefit

22  of her daughter, that can be a legitimate spendthrift trust.

23  The only reason I hesitate with Your Honor is there is a

24  portion of a spendthrift trust agreement that, arguably, at

25  inception, makes it not a spendthrift trust.

```
 1          THE COURT:  Well, you haven't made that argument in
 2    your briefing.  I've looked for it, but I haven't seen it.
 3          I mean, when it was originally set up -- I'm going to use
 4    Sharon Bingham as the beneficiary, but she was also the
 5    trustee.  I'm not sure you can have a legitimate spendthrift
 6    trust when the beneficiary is also the trustee.
 7          But you have, essentially, in your pleadings, I think,
 8    conceded that it was a legitimate trust, spendthrift trust,
 9    and Mr. Dean then became the trustee, and to whatever extent
10    there were defects in the spendthrift trust, wasn't it cured
11    so that when Mr. Dean became trustee, we've got a legitimate
12    spendthrift trust with assets that came from Sharon Bingham's
13    mother; is that where we are?
14          MS. TSOUMAS:  It was not our intention to concede
15    that point, but I recognize Your Honor's points on that.
16          THE COURT:  You've pretty much conceded it in the
17    pleadings, have you not, and in the briefs you filed?
18          MS. TSOUMAS:  We certainly agree that we have focused
19    our attention to different arguments about the trust losing
20    its spendthrift character.
21          THE COURT:  Let's assume it was -- going forward now,
22    we're going to assume it was a legitimate spendthrift trust
23    at that moment when Mr. Dean became trustee.
24          Now, what happened to make it not so?
25          MS. TSOUMAS:  So when Mr. Dean became the trustee per
```

1    the document that Your Honor just referenced, he's testified

2    about why he did that.

3        Mr. Dean has specifically testified that one of the

4    reasons for becoming the trustee of the Sharon Graham Bingham

5    trust was, and I quote, "I didn't want Shari or David being

6    the trustee of any trust because of any creditor attempting

7    to attack that trust."

8        One of his purposes was to hinder, delay, and defraud

9    creditors.

10        So it doesn't stop there, of course.  That's just the

11   beginning.  What does Mr. Dean do next?  This was in

12   September of 2010 that Sharon released her responsibilities

13   as the trustee.  In November of 2010, Mr. Dean writes an

14   email where he specifically advises Mr. Bingham to keep any

15   investment and profit offshore, away from creditors.  That's

16   Mr. Dean's -- one of his second steps as he comes up with

17   solutions for the Binghams.

18        Now, let's turn and talk about the trust and how it loses

19   its spendthrift character.  I'd like to first pause, if I

20   can, Your Honor, on how a legitimate spendthrift trust is

21   supposed to work.

22        So as we discussed briefly, Francis, the mother, puts

23   money into the Sharon Graham Bingham 2007 Trust for the

24   benefit of Sharon.  As a legitimate spendthrift trust, the

25   way this works is that the income annually goes to Sharon,

1  and the principal, as appropriate.  That's how it's supposed

2  to work.  Let me show you how it actually worked.

3      So the first leg of this fraudulent transfer scheme is

4  that Mr. Dean had each of the Binghams -- David and Sharon,

5  Chris and Cherish, Kelly and Scott, all debtors -- put,

6  essentially, all of their assets into the trust.

7      So how did this work?  Each of these three groups of

8  people entered into a security agreement with the trust

9  whereby they would give a right to all of their property,

10  including Park Place Motors, a luxury car dealership;

11  investments in Bingo Properties and Biolytical Labs; their

12  condos and, essentially, all their real property, in exchange

13  for a promissory note.

14          THE COURT:  Well, let's just deal with the Park Place

15  Motors.  What was transferred into the trust and what value

16  did it have when it was transferred into the trust?

17          MS. TSOUMAS:  So Mr. Bingham transferred all of his

18  shares of Park Place into the trust.

19          THE COURT:  And what was it worth when he did?

20          MS. TSOUMAS:  That, we don't know, Your Honor.  We

21  know that subsequent to that, he's been taking a six-figure

22  salary from Park Place.  We know that --

23          THE COURT:  Well, no, that's different.  The question

24  is, when he transferred that stock in Park Place into the

25  trust, what do you allege was the value of that stock?

1           MS. TSOUMAS:  We do not know the precise value, Your

2    Honor.  We know that it was a luxury car dealership with

3    several -- many, many luxury cars, and that's how they'd been

4    living, in part, this luxury lifestyle, but we do not --

5           THE COURT:  It had debt as well, did it not?  It

6    wasn't just a debt-free business.  It had debt, did it not?

7           MS. TSOUMAS:  Mr. Dean has submitted that it did have

8    debt on it.

9           THE COURT:  Well, do you have any facts that would

10   suggest it didn't?

11          MS. TSOUMAS:  We do not have anything -- Mr. Dean has

12   not given us evidence that there was no equity in the

13   business.  We definitely do not know that as we stand here

14   today.  But I cannot answer, with precision, how much it was

15   worth.  I can tell you it was a luxury car dealership.  And

16   that was just one --

17          THE COURT:  When did that transfer occur?

18          MS. TSOUMAS:  It occurred in 2012.

19          THE COURT:  And when did your client first learn

20   about that transfer?

21          MS. TSOUMAS:  Those security agreements -- we learned

22   about the settlement agreement and this sham situation about

23   a year ago.

24          THE COURT:  Well, that's not entirely true, is it?

25   Didn't Mr. Dean meet with Mr. Weiss and Mr. Solomon on at

1    least one occasion, both of them, and didn't Mr. Dean and

2    others send a great deal of information to your client, or

3    your client's representatives back in the 2011 and 2014

4    period?

5         MS. TSOUMAS:  He did send information, Your Honor,

6    but knowledge of transfers alone is not sufficient to start

7    the running of the statute of limitations.

8         THE COURT:  Well, he also sent all the information

9    about the Umpqua litigation and the fact that the litigation

10   had been settled.  The trust had paid, I think, about

11   $3 million, and taken assignment of the judgment; is that

12   right?

13        MS. TSOUMAS:  Mr. Dean does submit that he did

14   provide that information to us, that's right.

15        THE COURT:  Well, do you deny that your client had

16   that knowledge?

17        MS. TSOUMAS:  We do not deny, Your Honor, that

18   Mr. Dean did provide information about litigation.

19        THE COURT:  Is that judgment ahead of you, in any

20   event?

21        MS. TSOUMAS:  Mr. Dean submits that it is because he

22   purchased it.

23        THE COURT:  What do you think?  It is a prior

24   judgment, is it not?

25        MS. TSOUMAS:  Mr. Dean purchased that judgment, and

1    he did it for a reason.  I can tell you what his own words

2    were with respect to that.

3              THE COURT:  Let's just deal with the judgment first.

4              MS. TSOUMAS:  Okay.

5              THE COURT:  Let's assume that they hadn't reached a

6    settlement.  That judgment would be sitting out there for $57

7    million ahead of you, wouldn't it?

8              MS. TSOUMAS:  It may have been, Your Honor.

9              THE COURT:  All right.  And is there anything

10   fraudulent or illegal about a trust settling with a judgment

11   creditor and taking assignment of the judgment?

12             MS. TSOUMAS:  So, Your Honor, there -- well, I can

13   tell you why he did it, which --

14             THE COURT:  Well, he did it.  Clearly, he bought the

15   judgment off at a very favorable settlement, and then got the

16   judgment assigned to the trust.  Is there anything fraudulent

17   about that?

18             MS. TSOUMAS:  Well, Mr. Dean has specifically stated

19   he did it to thwart efforts of other creditors from going

20   after assets.

21             THE COURT:  So what?  If he, the trust, pays

22   $3 million to settle a prior judgment to your client, and

23   takes back that judgment, is there anything illegal or

24   fraudulent about that?

25             MS. TSOUMAS:  In our opinion, Your Honor, he did it

1   with the purpose of hindering, delaying, and defrauding.

2              THE COURT:  What is your basis for that?

3              MS. TSOUMAS:  At Exhibit 68 in the record, so it's

4   Document Docket No. 5, Exhibit 68.

5              THE COURT:  What is Exhibit 68?

6              MS. TSOUMAS:  It is an email, and Mr. Dean writes an

7   email on July 1st, 2015, and talks about the Umpqua judgment.

8   I'm happy to direct Your Honor to there.

9              THE COURT:  Just a moment.

10     All right.  I have the email.  Go ahead.

11             MS. TSOUMAS:  On the last page of the email, Your

12   Honor, so page 3 of that exhibit.

13             THE COURT:  All right.  Go ahead.

14             MS. TSOUMAS:  He writes, "I purchased the Umpqua

15   judgment, which served as a shield, to protect any attempt by

16   a creditor to execute on the family's personal assets."

17             THE COURT:  So my question is, it sounds like a smart

18   lawyer purchasing the judgment.  What's fraudulent about

19   that?

20             MS. TSOUMAS:  Your Honor, there is no reason that he

21   would purchase the judgment to hold a judgment against

22   admittedly insolvent debtors for any other reason besides a

23   fraudulent purpose.

24             THE COURT:  Well, excuse me, but didn't -- in that

25   litigation, didn't the bank challenge the spendthrift trust?

1    Didn't they move for a preliminary injunction?  Weren't the

2    same kind of issues being raised against the trust?

3              MS. TSOUMAS:  They did challenge the spendthrift

4    trust, they did, Your Honor.

5              THE COURT:  All right.  And the trust, then, made a

6    business decision to settle that claim, did they?

7              MS. TSOUMAS:  They made a business decision to settle

8    the claim, but then they took the judgment and, in Mr. Dean's

9    own words, to thwart other creditors, and you wouldn't do

10   that when the debtors were insolvent.  It has no rational

11   business purpose other than to hinder, delay, and defraud.

12             THE COURT:  And when did your client first learn that

13   the Umpqua judgment had been assigned to the trust?

14             MS. TSOUMAS:  Mr. Dean has that in his declaration.

15             THE COURT:  Yes, he did.  And when did he tell you

16   that he told you that?

17             MS. TSOUMAS:  Let's see.

18      He claims that he told us that in paragraph M on page 16

19   to 17 of his declaration, Your Honor.

20             THE COURT:  Well, just a moment.

21      Well, he tells you, on page 15 of his declaration, at

22   Subsection K, that Umpqua Bank's assault on the spendthrift

23   trust was going on when he met with Mr. Weiss and Mr. Solomon

24   on February 8th of 2010, and then he described the

25   declaration of Attorney Vanderhoff, who was representing the

1    trust, and a copy of his declaration is Exhibit J, and he

2    states that the position was that the trust creditor, Umpqua

3    Bank, was saying the trust was not valid, and the trustee and

4    his lawyers were saying it was valid.

5        That was way back in 2010, when your clients learned that

6    information; is that right?

7            MS. TSOUMAS:  What you just read, yes, but with

8    respect to the assignment to the trust, I believe that in

9    paragraph M, it claims that he told us in April of 2011.

10           THE COURT:  All right.  So since April of 2011, do

11   you concede that your clients knew that there'd been a

12   settlement agreement?  Didn't your clients even get a copy of

13   that settlement agreement?

14           MS. TSOUMAS:  I did not receive a copy of that

15   settlement agreement at that time.  The first time, I don't

16   believe I saw --

17           THE COURT:  I'm not talking about what you saw.  I'm

18   talking about Mr. Weiss.

19           MS. TSOUMAS:  Yes, that's what Mr. Dean said; that he

20   saw --

21           THE COURT:  No, I'm talking about Mr. Weiss.  Have

22   you talked to Mr. Weiss about this?

23           MS. TSOUMAS:  I have talked to Mr. Weiss repeatedly.

24           THE COURT:  Well, what does Mr. Weiss say he got in

25   2011?

1            MS. TSOUMAS:  Your Honor, I will take -- for purposes

2      of right now, we'll take Mr. Dean's word for it --

3            THE COURT:  Can I assume that the facts stated in

4      Dean's declaration is true?

5            MS. TSOUMAS:  That he told us about the judgment

6      being assigned to the trust?

7            THE COURT:  And sent Mr. Weiss a copy of it.

8            MS. TSOUMAS:  And we will not dispute that for

9      purposes of this.

10         That doesn't take away, Your Honor, from the fact that

11     this transaction that I'm describing is an actual intent to

12     hinder, delay, and defraud.  And I'm happy to unpack it

13     further.

14           THE COURT:  Well, I'm having trouble with the

15     concept.  The trust has got a $57 million claim against it.

16     If they just let that claim sit there, it would have been $57

17     million ahead of your client; is that right?

18           MS. TSOUMAS:  It may have been, Your Honor, yes.

19           THE COURT:  All right.  What he's done now is he's

20     settled that claim, and you're saying that because he took an

21     assignment of the unpaid judgment, that that -- and he did it

22     to protect the assets of the trust, that that's fraudulent?

23           MS. TSOUMAS:  What we're saying, Your Honor, is that

24     the trust, for various reasons that I'm happy to go through,

25     has lost its spendthrift character because it's not being

1    used as a legitimate spendthrift trust.

2           THE COURT:  No, you're mixing apples and oranges now.

3    I want to talk about just what you -- I want to understand

4    your theory of why the assignment of this judgment in

5    connection with the settlement was not a legitimate

6    transaction that they took.

7           MS. TSOUMAS:  For two reasons, Your Honor.  One,

8    Mr. Dean specifically says, in the exhibit I directed Your

9    Honor to, that he did it to delay, hinder, and defraud

10   creditors; and, two, it is not a rational business decision

11   to take on a judgment against insolvent debtors.  On its

12   face, it doesn't look right.

13          THE COURT:  I'm having trouble with your logic.  He

14   took a $57-million claim, he settled it for $3 million and

15   change.  What's he going to do, then?  Is he just going to

16   say -- discharge your judgment?  He can take the judgment,

17   can't he?

18          MS. TSOUMAS:  That's what he did, but in his own

19   words, he did it to hinder and delay other creditors.

20          THE COURT:  So show me his words again, his actual

21   words.

22          MS. TSOUMAS:  It's Exhibit 68, on the third page.

23          THE COURT:  Well, the words he uses is, he -- the

24   judgment serves as a shield to protect any attempt by a

25   creditor to execute on the family assets.

 1    I'm having trouble with understanding why that was not a

 2    perfectly legitimate thing to do.

 3         But for purposes of this motion, this motion you're

 4    arguing, is one for preliminary injunction.  You've got to

 5    convince me that the substance of what was going on here with

 6    this trust, you just learned about it in this recent

 7    discovery, and what I'm suggesting to you is that Mr. Dean's

 8    declaration outlines chapter and verse with exhibits of a

 9    great deal of information that was provided to your clients

10    way back in 2011 and then again in 2014.

11         So you had this judgment for a long time.  Why is it that

12    you're coming in today or this month or last month and asking

13    for a preliminary injunction to freeze the assets?

14              MS. TSOUMAS:  I'm happy to go directly to that, Your

15    Honor, and I would just submit that this -- with respect to

16    the Umpqua judgment, it's just one part of an overall scheme

17    that, if Your Honor would allow me to, I'd like to unpack

18    further.

19              THE COURT:  You may certainly do so.

20              MS. TSOUMAS:  Okay.

21         So as I indicated, all of the Binghams put all of their

22    property into the trust, and then there was a security

23    agreement, and then what happened is, conveniently, all of

24    them defaulted on the loans.

25              THE COURT:  So let's stop right there.

1          When did your client learn that the other Binghams had put

2    their assets into the -- for example, the Park Place Motors?

3    I think that's what it's called.  When did you learn that?

4              MS. TSOUMAS:  I believe, Your Honor, that -- I know

5    we learned about the settlement agreements.  We received

6    those in January of 2017.

7              THE COURT:  Well, as I understand the facts, in

8    December 31, 2012, Park Place stock was transferred to

9    satisfy a $1.9 million debt.

10             MS. TSOUMAS:  That is what Mr. Dean called it, yes.

11             THE COURT:  And all of the assets were then pledged,

12   the security interest.  When did you get copies of those

13   security interests?

14        Mr. Dean tells us that at the end of 2008, Park Place had

15   a substantial negative net worth and negative retained

16   earnings of $8.9 million.  He says he felt that the stock was

17   worthless when it was transferred to the trust.  So that's

18   his first claim.  The second is that he told you guys about

19   it.  When did your representatives learn about this transfer

20   of the Park Place Motors?

21             MS. TSOUMAS:  Your Honor, we're looking for that

22   right now.  But even if we learned about it in 2011 or 2012,

23   again, it is just one piece of this four-part fraudulent

24   transfer scheme.

25             THE COURT:  Well, but I'm trying to unpack the

1   transactions.  That's one of the major transactions you're

2   complaining about, is it not?

3           MS. TSOUMAS:  It's one of them, Your Honor, yes.

4           THE COURT:  All right.  Let's fast-forward.

5      You're claiming Mr. Dean then granted -- or the trust gave

6   $3 million to Park Place Motors so they could -- and he took

7   back a promissory note in security.

8      Could the trust do that?  Could a spendthrift trust go out

9   and invest in a business?

10          MS. TSOUMAS:  So a legitimate spendthrift trust is

11  permitted to invest in a business.

12          THE COURT:  I'm going to ask you to assume that the

13  trust -- this is the only transaction, and you've kind of

14  conceded that it was a legitimate spendthrift trust.

15     Could the trustee go out and invest in Business X -- even

16  though you and I would not wish to put our money there -- and

17  take back the assignment of a promissory note, security

18  interest?  The trustee can do that, can it not?

19          MS. TSOUMAS:  Yes, the trustee can make reasonable

20  investments.  That's not what giving money to Park Place has

21  been in this case, and I'm happy to explain.

22          THE COURT:  All right.  Please do.

23          MS. TSOUMAS:  So as I showed you earlier, a

24  legitimate spendthrift trust is for the benefit of the

25  beneficiary.  And the reason we're seeing lots of money go to

1   other places besides Sharon is because once they go to

2   Sharon, they will be immediately garnished.

3       So what they do is divert money to other close family

4   friends, other family businesses in order to divert the

5   money.

6       So with respect to Park Place, for example -- and we'll

7   skip ahead to that -- Park Place, as you know, was given

8   entirely to the trust.  And as Your Honor correctly noted, in

9   March of 2017, a $3 million loan was given to Park Place.

10  That is true.  And Mr. Dean did, in fact, call it a loan.  We

11  questioned him putting that terminology on it.  But what is

12  Park Place?  What is the connection between Park Place and

13  the Binghams?

14      Mr. Bingham takes his salary from that company, and he

15  pays his credit cards, including his personal credit card

16  from that company.  And let me show you his testimony to that

17  effect.

18      He was asked -- this is David Bingham's testimony -- "Do

19  you have a credit card?

20      "I have a Park Place credit card.  I do have an American

21  Express card.

22      "Who pays that bill?

23      "Park Place.

24      "Who pays your Am Ex card?

25      "Park Place."

1      Your Honor, the money is supposed to go to Sharon.  It's

2   being diverted to other companies, Park Place being one of

3   them, to hinder, delay, and defraud.  It is a cover for

4   getting money to creditors.  This is one part of the scheme.

5      But, Your Honor, I'd like to back up a little bit and look

6   at CCRB, because that is also one part of the scheme.

7      As Your Honor knows, Chris Bingham represented to the

8   State of Washington that CCRB was an investment banking

9   company.  I personally deposed Mr. Bingham on December 1st,

10  2017, and he admitted, repeatedly, CCRB has no employees, no

11  meetings, no minutes, and he freely and always uses the

12  accounts from CCRB for his personal expenses.

13     CCRB has been getting $15,000 a month that Chris has been

14  using personally.  That is in addition to the $1.2 million

15  that was given to him to renovate his home, install an

16  infinity pool, put granite countertops on in his kitchen, and

17  have stainless steel appliances.

18     Your Honor, in a legitimate spendthrift trust, the money

19  is supposed to go to Sharon.  The response you'll hear from

20  the defendants is she is allowed to gift money to her child.

21  That is not what's happening here.  They can give the money

22  to Sharon, and she can freely choose, like all parents do, to

23  help their kids from time to time.  They don't do it that

24  way.  They put it through a fake company, and give it to

25  Chris.  Why?  To hinder, delay, and defraud to the tune of

1   millions of dollars.

2        But it goes further than that.  Your Honor referenced

3   loans.  This is what they do.  Let me show you some of the

4   transfers on the next page.

5        These are, as you know from our complaint, between

6   February of 2016 and June of 2016, over $450,000 went

7   directly from the trust to CCRB, not to Sharon, to CCRB, for

8   the Hunts Point pool, Chris's infinity pool.  So this is all

9   between February and June.  What does Mr. Dean do to make

10  this look legitimate?  He, thereafter, in November, five

11  months later, puts together a half-page piece of paper that

12  says those advances are a loan and they're going to be paid

13  back.  Your Honor, this is just part of the classic scheme

14  that they have been creating for ten years.

15           THE COURT:  So let's just stop right there.

16       Clearly, you make a strong argument that that which has

17  been paid to CCRB, that that is a shell company that has no

18  real substance and that these monies are being used.  Now,

19  this money has been transferred to that company and then used

20  for these purposes.

21       If I were to grant a preliminary injunction -- let's just

22  take that segment -- what would the preliminary injunction

23  say?  That they could not sell the swimming pool and the

24  house?

25           MS. TSOUMAS:  Your Honor, so there are a couple of

1  points there.  The $1.2 million is a fraudulent transfer.  So

2  that amount of money -- they can't do anything with the

3  amount of money that was given to them if they still have it.

4  Right?  But if we go to the remedy slide at end, with respect

5  to CCRB, we're asking Your Honor to freeze the assets of CCRB

6  and enjoin the defendants from transferring any assets or

7  receiving any from CCRB.

8          THE COURT:  All right.  Let's go back to the trust.

9  You're asking for an order freezing all the trust assets.

10         MS. TSOUMAS:  Yes.  I'm happy to continue doing that.

11     So if we go back, I'd like to show Your Honor the fourth

12  piece that we're aware of with respect to this fraudulent to

13  this fraudulent transfer scheme, and that is giving money to

14  Mr. Dean personally.  These are recent developments, which I

15  will tell Your Honor about now.

16     So we have recently learned, and did not learn until

17  January of 2018 -- and let me back up because that's

18  important.

19     We served a subpoena on the trust in November of 2016.

20  Mr. Dean has purported that every time Mr. Weiss asked, he

21  gave him documents.  But we asked for simple things like

22  financial records, bank accounts.  We were told no.

23     So as Your Honor knows, we came to you in March of 2017,

24  and in May of 2017, you granted our first motion to compel.

25  We received documents in July of 2017 that were heavily,

1    heavily redacted.  We also received not a single email.  We

2    went to the Mr. Dean and said we need more.  He said no.  We

3    came back to Your Honor yet again, and you yet again granted

4    our motion to compel.

5        It wasn't until January 25th of 2018 that, for the first

6    time, we received the financial records that we asked for

7    from the trust back in November of 2016, and the emails.

8    Within those documents we learned that Henry Dean himself has

9    taken over $300,000 directly from the trust and diverted

10   another over $60,000 through his own fake company, BGH

11   Holdings, LLC.

12       If we go to the next page.

13             THE COURT:  So, again, in terms of the preliminary

14   injunction motion, what would the order say?

15             MS. TSOUMAS:  With respect to the trust, Your Honor,

16   if we go --

17             THE COURT:  With respect to Mr. Dean.  First, he has

18   acted as trustee, clearly, and he's entitled to some

19   payments, is he not?

20             MS. TSOUMAS:  That's, actually, why this part of the

21   fraudulent transfer scheme is so concerning to me personally

22   and to our client.  Mr. Dean was deposed in a prior

23   proceeding, and he was asked --

24             THE COURT:  Not in this litigation?

25             MS. TSOUMAS:  He was not, Your Honor.

1          THE COURT:  Okay.

2          MS. TSOUMAS:  If we could show the testimony.

3      He was asked, "It's not your expectation to be paid

4  anything?"  And he said, "Specifically in connection with the

5  trust?  No."

6      But he acknowledged there was a, quote, handshake

7  arrangement he had with the Binghams, whereby -- and I

8  quote -- as the family goes, so does Henry Dean.  If the

9  family does well because of my work, so will Henry Dean.

10         This is what's concerning to us, Your Honor, because this

11  was several years ago that he testified to this.  The only

12  logical conclusion is the family has done pretty well under

13  this fraudulent transfer scheme because Mr. Dean is taking

14  hundreds of thousands of dollars out of the trust.

15         THE COURT:  Again, help me understand.  The

16  preliminary injunction order would freeze any assets that

17  Mr. Dean has received that he still has from the trust.  Is

18  that what you're asking for?

19         MS. TSOUMAS:  So with respect to -- if you go to the

20  last slide, please.  We're asking for a couple of things,

21  Your Honor.  So with respect to the spendthrift trust itself,

22  we're asking for a freeze of it, and I can tell Your Honor

23  more about why we're doing that.

24      So we want to freeze all the trust and enjoin the

25  defendants from transferring any assets that they receive

1    from the trust.  So with respect to the $360,000, at least,

2    that Mr. Dean has received from the trust, we are, in fact,

3    requesting that that be frozen and that he doesn't transfer

4    any of that money to anybody else that he still has.

5              THE COURT:  Well, we don't know whether there is

6    anything left, do we?

7              MS. TSOUMAS:  And that is the point Your Honor made

8    at the beginning.  We don't know that yet.  That is why we're

9    here, in fact.

10             THE COURT:  So let me back up to where we started

11   this morning.

12       I've dismissed Mr. Dean individually from the complaint

13   without prejudice because of the jurisdictional issue.  How

14   does that -- how does my ancillary jurisdiction, which needs

15   to be a little bit fleshed out by additional briefing, play

16   into what I could do with respect to enjoining Mr. Dean or

17   assets he has received?  I mean, is that all part of the

18   ancillary jurisdiction, do you think?

19             MS. TSOUMAS:  Mr. Dean has a couple of roles in this

20   case.  As you know, he is a trustee, and he's also a

21   transferee of money.  And so respectfully, Your Honor, as a

22   transferee of money, we believe he should still be in the

23   case as an individual because he's, undisputedly, received

24   $360,000, and so he should be in the case to that extent,

25   respectfully.

1       But with respect to the trust itself, what we're asking

2   for is a freeze of the trust, and we have a few different

3   reasons for that that I'm happy --

4           THE COURT:  Before you get to the reasons, I mean, I

5   looked at your proposed order.  It doesn't seem very

6   workable.  I mean, I'm not going to be sitting here approving

7   every time Sharon Bingham wants to go to Starbucks and get a

8   cup of coffee, and if she needs money from the trust.

9       So can you propose to me some alternative that would allow

10  normal use of trust funds for the benefit of Sharon Bingham?

11  She's the beneficiary of this trust, is she not?

12          MS. TSOUMAS:  I anticipated that question, because

13  when I looked back at it last night, too, I thought you might

14  not want to be playing that role.

15      Your Honor, we're happy to come up with alternatives.

16  Frankly, what we're asking the court to do is to preserve the

17  status quo for us, because we're seeing so much money come

18  out.  And if Your Honor would like to substitute that

19  authority to a third person, a special master, somebody,

20  we're happy to come up with alternatives and submit them to

21  the court right away.

22          THE COURT:  Okay.  Go ahead and continue.

23          MS. TSOUMAS:  Okay.  So if we can go back to the

24  money going to Mr. Dean.

25      Again, with respect to BGH and Henry Dean, I would submit,

1   Your Honor, that there is only one reason that you would do

2   this.  Again, a legitimate trust is supposed to be giving the

3   money directly to the beneficiary.  It doesn't work that way

4   because it was being garnished.  So giving it to Mr. Dean and

5   Mr. Dean via his holding company is another way to hinder,

6   delay, and defraud.  But it keeps going, as you know.

7        There is another leg to this fraudulent transfer scheme,

8   and that is HyTech.  HyTech, as Your Honor knows, is a

9   company, and, again, Mr. Dean was the executive of.  Mr. Dean

10  has given from the trust over $360,000 to HyTech.  And,

11  again, Your Honor, we did not learn that until our two

12  motions to compel and the documents we received in January of

13  2018.  We filed our complaint and the preliminary injunction

14  motion on the 15th of February, just about two and a half

15  weeks after receiving all that information.

16       If we go to the next slide, this is an illustration from

17  our complaint of the money that we're seeing, that we just

18  learned about, going to HyTech.  And Mr. Dean wants to tell

19  you that that is a reasonable loan, a reasonable investment.

20  But in recent documents that we just received, emails that we

21  received this year, Cicilia Elali specifically says that

22  HyTech is a long way off from disbursement to shareholders.

23       Your Honor, this is not a legitimate business investment.

24  It is yet another part of the fraudulent transfer scheme to

25  actually hinder, delay, and defraud.

```
 1        But, Your Honor, if we keep going.
 2             THE COURT:  Why don't we take another short recess,
 3   maybe 10 minutes, and then we'll go until 12:15 or 12:30, if
 4   we have to, but I do have an afternoon calendar.
 5        Have you provided us with a copy of your presentation?
 6             MS. TSOUMAS:  May I approach and provide you one?
 7             THE COURT:  You can do it during break.
 8             MR. JOHNSTON:  Your Honor, I want to make sure we
 9   have a balance in time.
10             THE COURT:  You wish to be heard, do you?
11             MR. JOHNSTON:  I do, actually.
12             THE COURT:  Well, we'll give you ample opportunity.
13             MR. JOHNSTON:  And I would like the court to have
14   this because I want to go through it, and I think it would be
15   helpful.
16             THE COURT:  Certainly.
17             MR. JOHNSTON:  Thank you.
18             THE COURT:  We'll be in recess.
19                  (Court in recess 11:21 to 11:29 a.m.)
20             THE COURT:  Well, I've learned from my staff that I
21   do have a lunch commitment out of the office with a judge
22   from a different court, and he's en route, so I'm -- we're
23   going to have end by at least five or ten minutes after
24   12:00.
25        I have a criminal calendar this afternoon, and if we need
```

1   more time, I can have you come back around 2:30, or another

2   day.  So be thinking about calendars and how we'll proceed.

3       All right.  Counsel?

4           MS. TSOUMAS:  Thank you, Your Honor.

5       So at the end of the day, this is what we know, and this

6   is only what we know thus far of the fraudulent --

7           THE COURT:  Are you referring to this?

8           MS. TSOUMAS:  I am.  I've gone through everything

9   I've learn thus far.  I am fairly certain, Your Honor, this

10  isn't it, but, again, a legitimate spendthrift trust is

11  giving money to Sharon, and instead it's being diverted for

12  the actual intent, the actual intent to hinder, delay, and

13  defraud.

14      But let me tell you why we're here today on the

15  preliminary injunction.

16      Your Honor, just in January of 2018, as I told you, we

17  have seen hundreds of thousands of dollars go out of this

18  trust, including to pay Mr. Dean's alimony.  And this is in

19  addition to what we've learned from our other discovery thus

20  far:  $15,000 to Chris every month; a $3 million loan to

21  David's car dealership; $1.2 million to CCRB.

22      Your Honor, we are sincerely concerned that we'll get to

23  the end of this with a judgment in our favor, and there

24  simply will be nothing left.

25      Your Honor, I'd like to briefly address why --

1          THE COURT:  So one of the issues, really, is, if the

2     trust was in its right to settle with other creditors and

3     take an assignment of other judgments, at the end of the day,

4     even if you bust the trust, if you will, the judgments are

5     going to be sitting there, are they not?  You're not going to

6     be able to get ahead of those judgments.  I mean, at the end

7     of the day, is there going to be anything for you?

8          MS. TSOUMAS:  Well, Your Honor, we see that the trust

9     is bleeding hundreds of thousands if not millions of dollars

10    out.  So that shows that, despite those judgments, there's

11    still money moving out of this trust.

12         THE COURT:  Has your discovery learned what the

13    assets of the trust are as of now?

14         MS. TSOUMAS:  The last time we got an accounting of

15    that was in May of 2017 from Mr. Dean, where he represented

16    that the assets were worth about $13 million.  Through this

17    proceeding, he said $9 million.  But that's all we know at

18    the moment, Your Honor.  That will be subject to more

19    discovery.

20       So, Your Honor, with respect to our preliminary injunction

21    with respect to the spendthrift trust, we have a few

22    different theories, but one is unassailable.

23       To the extent a spendthrift trust, as I told Your Honor, a

24    legitimate one uses the money for a benefit of the

25    beneficiary.  Clearly, that's not happening here.  But it is

1    undisputed that when self-settled transfers, transfers of the

2    debtors' or the beneficiaries' own property, go into the

3    trust, those are void against creditors -- those are void as

4    to other creditors under Washington law, which is 19.36.020.

5        The only argument the defendants make that those

6    self-settled transfers do not destroy the spendthrift

7    character of the trust is that at the inception, this was a

8    spendthrift trust, intended to be, and we don't dispute that

9    it was intended to be.  And, again, we do not dispute that it

10   was intended to be a legitimate spendthrift trust.

11       However, under the restatement, third of trust, Section

12   58, when there are self-settled assets as well as assets put

13   in by someone like Francis, for example, it destroys the

14   spendthrift nature of the trust, period, end of story.

15       Your Honor can rule on the preliminary injunction on those

16   grounds alone because there is no authority to the contrary

17   that self-settled trusts do not destroy the spendthrift

18   nature of the trust.  None.  They have cited you no cases

19   that say that.  You can rule on that alone.

20       I'll give you one more by basis, and then I'll sit down

21   and cede the floor to the defendants.

22       But the other way you can rule in our favor, Your Honor,

23   is that Sharon Bingham controls the distributions of the

24   trust.  First, she was the sole trustee from 2007 until

25   September of 2010.  Second, I deposed Mr. Chris Bingham.  I

1    asked him, "How does this process work?  If you need more

2    than the $15,000 a month that you get from the trust, what do

3    you do?"  And he said, "I go to my mom, and I ask her."  I

4    said, "Do you call her?"  He said, "Sometimes, or I meet with

5    her."

6        "Would your mother send the money directly to CCRB, or

7    would she send it directly to the vendor?

8        "I think CCRB, primarily."

9        Mrs. Sharon Bingham is directing this trust, and under the

10   authority that we cited for Your Honor, *Britannia Holdings*,

11   for example, that destroys the spendthrift nature, and the

12   preliminary injunction can be granted on that basis alone.

13       Your Honor, we're asking for narrow, temporary, emergency

14   relief so we don't get to the end of this and see that all

15   this money I just showed you, Your Honor, is gone.

16       If Your Honor has any more questions, I'm happy to answer

17   them.

18           THE COURT:  If I granted you that relief, what kind

19   of bond would you need?

20           MS. TSOUMAS:  Your Honor, it is the defendants'

21   burden to substantiate a bond, and they haven't done that.

22   All we're asking is for the trust to be used as a legitimate

23   trust, which means we freeze it, and that Mrs. Sharon Bingham

24   can come to Your Honor or to a third party, to lessen the

25   burden on Your Honor, under paragraph 4 of our proposed

1   order, and her reasonable expenses can be used from the

2   trust.  That's what Washington law allows, and that's what

3   we're asking for.  They have not substantiated their burden

4   on that.

5           THE COURT:  If I were to appoint a special master,

6   would your client be prepared to pay for that special master?

7           MS. TSOUMAS:  I'd have to consult the client on that

8   point, Your Honor, but we're open to alternatives for sure.

9           THE COURT:  All right.  Thank you.

10          MR. JOHNSTON:  May it please the court.  Bruce

11  Johnston, and I've identified the parties I represent, Your

12  Honor.

13      Vigilantibus non dormientibus aequitas subvenit:  Equity

14  aids the diligent not the indolent.  Maximum of equity.

15      The status quo in this case, they said they want to

16  preserve it, the status quo in this is for eight years.  The

17  trust has functioned as it has been described, with LVB

18  sitting on their hands, doing nothing, despite the

19  information they got in 2009, 2010, and 2011.

20      I want to go through this presentation.

21          THE COURT:  They had information back in 2010 and

22  '11, but what about the recent discovery, and how can you

23  justify any payments to Chris Bingham's corporation and to

24  him and his family?

25          MR. JOHNSTON:  Let me start there.

1        Two charts in the material that you had -- let me find the

2    first one I want to talk about, which is at page 7.

3            THE COURT:  Page 7 of this handout?

4            MR. JOHNSTON:  That's correct.

5        Now, they complain about $1.2 million for Chris Bingham's

6    pool -- okay? -- but the information that was of public

7    record from 2008 or '9, forward, and it's in Mr. Dean's

8    declaration, establish the following things:

9        Number one, that that house was owned by Francis Graham

10   until just before her death.  It was subject to a first

11   mortgage.  It was unrenovated for 50 or 60 years.  It's a

12   mid-century house on a very valuable piece of property.  And

13   as Your Honor pointed out, the first-position security

14   interest, second-position security interest and the like were

15   held by the trust.  In other words, any equity above the

16   first mortgage is with the trust.

17           THE COURT:  What is the first mortgage?  How much

18   is --

19           MR. JOHNSTON:  The first mortgage is with Venture

20   Bank.  I think Mr. Dean indicates it's about a million-four.

21   I may be off.  And it's been there for some time, long

22   before.

23           THE COURT:  What is the property worth?

24           MR. JOHNSTON:  Your Honor, I'm not sure I'm qualified

25   to say that, but it's certainly worth more than two-and-a

1   half, three-million dollars.  But what has been put in the
2   record is that -- LVB put some stuff in the record, and what
3   it shows is this:  That prior to the improvements that were
4   made to the house and funded by the trust, in property in
5   which it holds all the equity, their documents, as indicated
6   in one of the exhibits to their motion for a preliminary
7   injunction, is that it was worth two and a half or so, and
8   now it's worth over four.  So I submit to you that the trust
9   funding the improvements to take a house, bring it through 60
10  years of non-improvements, and increased its value by an
11  amount more than the debt is a reasonable act as to an asset
12  in which it holds all of the equity if the house were ever
13  sold.
14         THE COURT:  Is it followed, then, that a preliminary
15  injunction that would enjoin Chris Bingham and whoever owns
16  this house from taking any action to sell, mortgage, or
17  otherwise encumber it in any way would not have any harm?
18         MR. JOHNSTON:  Well, there wouldn't be any harm.
19         THE COURT:  We don't need a bond for that, do we,
20  because there's nothing that's being enjoined that isn't
21  already subject to encumbrances.
22         MR. JOHNSTON:  But there is also nothing to enjoin
23  because there is no value there.  It's subject, according to
24  the title report that we supplied to the court, to $50- or
25  $60 million, $70-, $80 million worth of judgments.  And as a

1    consequence --

2            THE COURT:  All right.  But let's dig a little

3    deeper.

4        What if I were to enjoin the trust from transferring any

5    trust funds to Chris Bingham or his family or his kids or

6    this corporation?  What would your position there be?

7            MR. JOHNSTON:  Well, my position would be that would

8    be fully inappropriate.  The funds in this trust come from

9    Francis Graham, Christopher's grandmother.  He is also a

10   residual beneficiary of this trust, and Mr. Dean has to

11   balance those positions.  But that fact is that Mrs. Sharon

12   Graham has one son and has the ability, I think --

13           THE COURT:  And he hasn't worked for ten years, he

14   gets 15 grand a month, he gets all this money sent from the

15   trust.  Who --

16           MR. JOHNSTON:  And if it's the trust funds, Your

17   Honor, it doesn't hurt them because they can't get to them

18   anyway.

19           THE COURT:  Well, then, there would be no harm in

20   issuing a preliminary injunction.

21           MR. JOHNSTON:  But certainly --

22           THE COURT:  I've read and looked at some of these

23   documents in terms of the formation of this entity, CCRB, and

24   I have to tell you, I think it's a fraudulent shell created

25   to avoid creditors.

1           MR. JOHNSTON:  No one has --

2           THE COURT:  That's what it says.

3           MR. JOHNSTON:  No one has ever concealed anything

4    about it.  All the creditors have been told about it, anyone

5    who asked about it in depositions and so forth, Your Honor.

6    It's there, but it hasn't hurt anything because any money

7    that went into it came from a trust that a creditor cannot

8    get to.  And that's -- and Mrs. Bingham, if she wants to ask

9    to make a gift, trustees -- I mean, I was a trustee for many

10   years on large trusts.  We often pay them indirectly or do

11   things.  But the trustee has the ability to decide whether or

12   not that is consistent with the testator's or the settler's

13   purposes.

14       The fact that that someone has a nice lifestyle that

15   doesn't come from money that they can't get in the first

16   place is none of their business, frankly.

17       And, Your Honor, I want to go back to -- this is one of

18   many things that they've come up with.  They say -- just a

19   second, and let's look at Slide No. 1 on their slides, and go

20   very quickly through them.  Let's look at the first one.

21          THE COURT:  So are we on --

22          MR. JOHNSTON:  On their slides.

23          THE COURT:  On their slides?

24          MR. JOHNSTON:  Yeah.  Take a look at No. 2.

25          THE COURT:  Is this plaintiff's?

1            MR. JOHNSTON:  There's only one set.  I'm just --

2            THE COURT:  Okay.  Go ahead.

3            MR. JOHNSTON:  They have this quote.  If you'll

4    notice --

5            THE COURT:  Where are you?

6            MR. JOHNSTON:  Let's go to No. 2.

7            THE COURT:  Page 2?

8            MR. JOHNSTON:  Page 2.  I'll go through them very

9    quickly.

10       Page 2, they said -- this about Ms. Bingham.  You'll

11   notice at the top of that it says, "Graham Bingham

12   Irrevocable Trust."  Your Honor might recall a case that was

13   before you involving John Hancock.

14           THE COURT:  I do remember that case.

15           MR. JOHNSTON:  Okay.  That was the Graham Bingham

16   Irrevocable Trust.  This has nothing to do with the 2007

17   Trust or anything in this case.  It had to do with that case.

18   And it was a life insurance case, and the court will recall

19   that.

20       Now, let's go to Slide No. 3.  They say, "Offshore, away

21   from creditors."  The only evidence about that was the China

22   boat, which was, A, told by Mr. Spencer Hall to Weiss in

23   2009, by Mr. Dean in 2011, indicating a boat in China brought

24   to Seattle and included in the Centrum settlement, fully

25   disclosed to everybody.  There is no evidence of anything

```
 1   offshore.

 2       Third, the fourth page, the outline of the trust.  Well,

 3   yeah, Francis -- and they have acknowledged in front of that

 4   court that this was a legitimate trust when it started.

 5       So let's go look at No. 5 where they introduce, and they

 6   say there were transfers of the Maui condos.  As you know,

 7   title to those condos was never transferred.  We've provided

 8   the title --

 9           THE COURT:  As I understand it, if Mr. Dean's

10   declaration is accurate, the title to those condos have

11   always been in the name of the Binghams.

12           MR. JOHNSTON:  That's correct, and they're subject to

13   mortgages, including -- their first mortgage is to a bank,

14   and their second mortgage is to Centrum, which Centrum always

15   had, which exceeded their value.

16           THE COURT:  Well, then, presumably, if that's true,

17   the plaintiff could go execute on those mortgages if they

18   felt they would get anything.

19           MR. JOHNSTON:  Well, the interesting thing there is,

20   the Umpqua judgment was filed there, the Centrum judgment was

21   filed there, other judgments were filed there.  They didn't

22   even bother to file theirs, you know, so there was at least

23   $100 million in judgments.

24           THE COURT:  Held by the trust.

25           MR. JOHNSTON:  Held by others as well, Your Honor.
```

1        One is in those title reports that there are other

2    judgments.  There's the Washington Trust judgment, there's a

3    number held by Washington Fed that was originally Horizon and

4    so forth.

5        Now, the same is true of the -- and Your Honor mentioned

6    Park Place Motors.  Let me go through why the record in this

7    case establishes there was absolutely no value ever in that.

8        Number one, Mr. Spencer Hall, on November 17, supplied a

9    list indicating a negative net worth of over $6 million.  He

10   then sent the tax returns, and the balance sheet schedules

11   indicated the exact same numbers.  They were negative.

12       But what's more important, Your Honor, is, we've attached

13   the complaint and a few other documents, I think they were

14   attached to my declaration, where the East West Bank, which

15   held a first security interest on all of the assets of Park

16   Place and all of the assets of the land on which it was

17   there, and it was about $17 million owed, if you add it up.

18   This was handled by Judge Jones.

19       That case proceeded.  There was an allegation of problems

20   with the trust.  The negotiations were with Mr. Beighle at

21   Lane Powell, and what happened was, as Mr. Dean's declaration

22   indicates, there was a reduction of over $10 million in the

23   settlement.  In other words, Your Honor, the liquidation

24   value and the value Mr. Dean was going to pay were very

25   close, one to the other.  And the creditor, to get full

1    recovery, elected to take a settlement from the trust, and as

2    a consequence, the entire -- number one, it was clearly

3    worthless and way underwater and could have been foreclosed

4    on by the bank.  And Mr. Dean then, through his brilliance,

5    reconstituted it long after -- this was 2014 or '15 or '16 --

6    he reconstituted it.  Set up, essentially, an ESOP.  The

7    majority of the company is now owned by the employees who are

8    unrelated to any of the Binghams, and it is proceeding as a

9    business, and a profitable one at this point and valuable to

10   the trust, nothing more than but good business operations.

11       And the record discloses all that.  A reasonable

12   investigation before filing this injunction motion would have

13   disclosed all of those things.

14       The $3 million didn't go in until after Mr. Dean had done

15   all those things, until after Park Place was evicted by Sound

16   Transit from its location and needed to go to a new building,

17   and the expenditure of $3 million was an efficient business

18   decision.  And the fact is, the trust owns only a minority,

19   42 and a half percent.  Mr. Bingham owns none of it.  He is a

20   salaried employee, and Mr. Bochmier, who works in parallel

21   with him, gets the same salary.  So, again, they've got their

22   facts all skewed and wrong.

23       Now, as to Mr. Dean, they quote -- well, let me go to the

24   David Bingham credit cards -- the thing they didn't tell you

25   is the rest of the deposition -- what's paid by Park Place on

1    Am Ex is deducted from Mr. Bingham's salary to the extent it

2    is not a legitimate business expense of Park Place.

3         Then what we have is, they complain about Mr. Dean getting

4    $360,000 for eight years as a trustee.  The last time I

5    looked -- and let's go back.  You recall that at the time

6    that early deposition was taken in the insurance case,

7    Mr. Dean had gone, and given his age, to a nonactive status,

8    and he had to go through horrible CLEs to get his license

9    back.  And then to say that he isn't entitled to compensation

10   of $45,000 a year for doing this is really -- I just can't

11   imagine that a court, who deals in attorney fees all the time

12   and fees to people of that kind, that that's an unreasonable

13   distribution.  To attach it to something nefarious, like,

14   okay, there has to be a payment made to an ex-wife, he's

15   entitled to his salary, and it's paid directly.  Your Honor,

16   there is nothing wrong with that.

17        THE COURT:  Doesn't there have to be some sort of

18   accounting?

19        MR. JOHNSTON:  There is.

20        THE COURT:  Where is the accounting as to Mr. Dean as

21   to what time he spent and what he's been paid?  He has a

22   fiduciary duty to that trust, and he knows, and I think that

23   would include some sort of detailed accounting of whatever he

24   thinks he spent and what he's entitled to.

25        MR. JOHNSTON:  A sufficient accounting, Your Honor,

1    but he does have a lawyer representing Sharon Graham

2    Bingham -- his family has represented her family since

3    1936 -- me, watching this whole thing happen.  So I suggest

4    that's a reasonable check and balance.

5              THE COURT:  Where are they watching it from?

6              MR. JOHNSTON:  Well, Your Honor, the fact is --

7              THE COURT:  So how much can Mr. Dean take out of that

8    trust?

9              MR. JOHNSTON:  Your Honor, he can take out whatever

10   the fees that are reasonable, under the document and under

11   the statutes in Title 11, Washington's Title 11, that permit

12   those fees.

13             THE COURT:  Doesn't he have to make some accounting

14   to the trust?

15             MR. JOHNSTON:  He does to the trust, but he does not

16   have to make any accounting to LVB.

17             THE COURT:  Have those accountings been produced

18   during the discovery?

19             MR. JOHNSTON:  I believe that the information that

20   you have here as to the payments certainly indicate that

21   there is a record of them.

22             THE COURT:  Well, I haven't seen those records.  Has

23   the plaintiff seen those records?

24             MR. JOHNSTON:  How did they manufacture this document

25   listing the payments, Your Honor?

1          MS. TSOUMAS:  Your Honor, we have not seen an

2    accounting of his reasonable salary, we've not, so-called

3    reasonable salary.

4          MR. JOHNSTON:  And they haven't raised an issue by

5    coming up with a total of $360,000 from the full records that

6    they have on the expenditures that would be anywhere near a

7    reasonable fee for the incredibly difficult things that

8    Mr. Dean has done.

9          THE COURT:  That --

10         MR. JOHNSTON:  Negotiating that $10-million

11   reduction, Your Honor, in the Park Place case; negotiating

12   the Centrum settlement; going through the Centrum litigation.

13         THE COURT:  Well, we're not here to decide --

14         MR. JOHNSTON:  Yeah.

15         THE COURT:  -- what's reasonable or unreasonable.

16   What we are attempting to do is find out where trust assets

17   have been going, and whether it's been legitimate.

18         MR. JOHNSTON:  Or there is a legitimate basis for

19   even addressing that question, Your Honor, and it seems to me

20   that they haven't done that.  For example, they use the

21   testimony from a different case, nine years ago, to cast

22   doubt that fees that are a fraction of what Kirkland & Ellis

23   would charge are unreasonable.  I don't think there is any

24   magnitude basis for that.

25         The --

1      THE COURT:  Just a moment.

2      MR. JOHNSTON:  Sure.

3      THE COURT:  Go ahead.

4      MR. JOHNSON:  Then, Your Honor, they object to the

5  investment in HyTech, you know, from Mr. Dean's declaration.

6  There was a $500,000 investment.  The $350- they have here

7  has been repaid.  And, secondly, you know the stock is

8  selling at over $3 a share?  You'd be surprised at the

9  investment people.  That makes it worth about a million-nine.

10 It seems to me that's a pretty good business investment, and

11 they don't have a single basis for saying the slanderous

12 things they say about HyTech, albeit a startup, one in which

13 we suggest that a trustee -- based upon the language of the

14 trustee drafted by Mr. Roberts, is -- there certainly is no

15 records here.

16     The fact that it is a long way off for distributions, a

17 trustee has an obligation to balance the interest of the

18 current beneficiary with those residual beneficiaries.  So

19 long-term investments are not improper, and there's been no

20 case law and no facts to indicate to the contrary.

21     The second issue, Your Honor, is that the transfers and

22 the complaints that they allege are more than four years ago.

23 They did have notice of this.

24     Mr. Weiss and Mr. Solomon have provided nothing to this

25 court to indicate the slightest circumstance that they were

1    misled or acted on anything other than a determination that

2    there was nothing there to go after.

3        Now, the one thing this record shows is that Dan Brown did

4    go after it, and he emptied the cupboard, Your Honor.  He was

5    the first one there.  Umpqua.  I call Dan ultra diligent.

6    But then we had, after Dan Brown, we had Rick Schroeder.  And

7    then we had Washington Trust out of Spokane, good lawyers,

8    and they brought our old friend Hugo Esparza, deputy sheriff,

9    who -- I don't know how he maintains his composure in doing

10   his job, but he came down Mr. Bingham's driveway with a truck

11   and some lawyers --

12            THE COURT:  I read the brief.

13            MR. JOHNSTON:  -- and he was going to get the others.

14       Now, Washington Trust had a judgment of over $2 million.

15   They evaluated what collateral they could take and what the

16   liquidation value would be, and they agreed to take a million

17   dollars for it.

18       Now, to move forward on that, the documentation of those

19   transfers omitted the wedding rings of Mrs. Sharon Bingham

20   and Kelly Bingham, and those were executed on by Centrum.

21   Mr. Dean, on the courthouse steps, paid $150,000 for it, and

22   under the theory that you're hearing now, they get to do that

23   again and again and again.  The assets of the Binghams did

24   not amount to -- and I think there's sufficient in the

25   record -- did not amount to a total of what other creditors

1   have collected.  In other words, everything that could be

2   collected by creditors was collected by creditors.

3        And the legitimate transactions of buying judgments,

4   making settlements, we settled with others without any

5   payments, this was a result of a fraud against the Binghams,

6   and Mr. Dean had been brilliant in recovering it, he's been

7   open, he was honest with Mr. Weiss, and there is no evidence

8   to the contrary.  And, Your Honor, we don't think that, given

9   the extraordinary requirements of a preliminary injunction --

10       Now, I just want to go to the damage issue.

11       This company -- Mr. Dean has to have Park Place function.

12  He's watching over HyTech and the investments of this trust.

13  There is no legitimate business without a significant bond,

14  because if the entire flows that have been the status quo for

15  eight years are dried up, there will be damages.  And

16  Washington law says that you can't interfere or attack trust

17  property without incurring liability for it.  And because of

18  that, we indicate and request the court to consider a very

19  large bond because, to the extent that there is follow-on

20  litigation, we'd like to bond to be sufficient to cover

21  those, because there is case law -- not federal but

22  Washington -- that would limit damages to the amount of the

23  bond.

24       I want to give time and let Mr. McGothlin or Mr. Henrie

25  speak to these issues.

1        Unless the court has any questions.

2            THE COURT:  You have about five more minutes.

3            MR. HENRIE:  Your Honor, I have five minutes, and I

4    need to share that with Mr. McGothlin.

5        Let me just say this, Your Honor:  You were definitely

6    right on exactly where this whole thing completely falls

7    apart, and that is, this was a spendthrift trust, the assets

8    in that trust were exempt from the collection of creditors.

9        Now, you cannot defraud a creditor out of an exempt asset.

10   The statute defines assets as assets that are not exempt and

11   that are not encumbered.  There is nothing that's been

12   discussed today that wasn't exempt and wasn't encumbered.

13       You asked how did the trust lose its spendthrift status.

14   I don't know that we ever really got an answer, but

15   apparently one argument is that Sharon was once the trustee.

16   You asked does that destroy the spendthrift status.  No.  The

17   reason why is because when Sharon was the beneficiary of this

18   trust deed, she had no ability to distribute the corpus of

19   the trust.  She was only entitled to the income.  She's still

20   entitled to the income to this day.

21       It wasn't an issue that had anything to do, didn't have

22   impact on the exempt status of the assets of the trust.

23       Now, the other argument is, oh, there were some

24   self-settled assets that went into the trust.  Well,

25   self-settled doesn't mean assets you acquire from a creditor

1    when you have a secured claim.

2        They talk about these security interests as sham

3    transfers.  There's no evidence that there is any sham here

4    at all.  All the evidence is is that this trust is a massive

5    creditor of the Binghams, including Sharon Bingham.  Any

6    money it ever got, it was entitled to get from Sharon and her

7    children because of its ownership of judgments, because of

8    loans it had made, because of security interest it had.

9        They talk about these transfers being transferred multiple

10   times.  They were.  Sometimes they paid a bank for them,

11   sometimes they collected a loan on them, and then there were

12   judgments.

13       She talked about, gee, why would a trust acquire these

14   judgments or buy these judgments?  You pointed out, "It

15   sounds like a smart thing a lawyer would do."  You've,

16   obviously, been a lawyer longer than the lawyer who was

17   presenting this case, including me.  It is a smart thing to

18   do to acquire judgments.  It is a smart thing to protect the

19   assets.

20       There's been no presentation here that those exempt assets

21   lost their exempt status.  They said the assets that they're

22   trying to get you to hold up, to enjoin, are assets that they

23   never could have gotten, they never will, and they haven't

24   shown you any way that they can.

25       I'd love to have more time to talk to you about trusts,

1  Your Honor.  Someday I hope I get a chance.  I'll turn it to

2  over to Mr. McGothlin.

3         MR. MCGLOTHIN:  Your Honor, I'm just going to make

4  three points.

5      I've talked with counsel in the hallway, and with all this

6  going on, the FRCP 26 deadlines for conference are due today.

7  If there is going to be a new complaint, we should probably

8  kick those deadlines out in accordance with your order.

9         The second point I'd like to make on behalf of Henry Dean

10  individually and Cicilia Elali individually are that you

11  dismiss them from the complaint.  I think it would be hard to

12  enter a preliminary injunction against them at this time

13  since they're not defendants in the action.

14         THE COURT:  Well, clearly, I wouldn't be enjoining

15  Mr. Dean.  I would be enjoining the trust.

16         MR. McGLOTHIN:  That's not my client.

17         THE COURT:  I understand.

18         MR. MCGLOTHIN:  I'm just --

19         THE COURT:  Go ahead.  Your third point?

20         MR. MCGLOTHIN:  Okay.  My third point is -- just -- I

21  want to just back up and take a 40,000-foot view of this.

22      The undisputed evidence in Mr. Dean's declaration is the

23  legitimate spendthrift trust character that was set up by

24  Francis Graham for the benefit of her daughter, Sharon

25  Graham, was the shares in this company that was sold when

1    Safeco was bought out by Liberty Mutual and generated $14

2    million principal for the trust.

3        Ms. Tsoumas said it was $14 million last year, and it's $9

4    million now.  That doesn't seem like you're bleeding all that

5    much money out of the trust.  So there's the same -- the

6    assets have just changed forms from what the original

7    spendthrift character was.  The money was paid out to

8    creditors, security interests were taken back because people

9    that are ultimately responsible for having to pay those

10   creditors had to answer to the trust to make the payments for

11   them.

12            THE COURT:  Is there any reason why I couldn't, in

13   equity, order an accounting, an inventory of the trust and

14   its assets as of today, to be filed under seal?

15            MR. JOHNSTON:  You wouldn't need to order it, Your

16   Honor, you'd just need to ask, and we would provide it.

17            MR. HENRIE:  Absolutely, Your Honor.

18            MR. MCGLOTHIN:  We tried to do that in Mr. Dean's

19   declaration.  We tried to reverse-engineer all the assets

20   that were in the trust today, and go back.  And it's under

21   oath.

22            THE COURT:  You are all in such agreement.  Is there

23   any reason why that couldn't be provided to the plaintiffs as

24   well?

25            MR. MCGLOTHIN:  No.

1          MR. JOHNSTON:  Confidentiality.  We'd like it to be

2     confidential to within the issues in this case, but beyond

3     that, yes.

4          THE COURT:  All right.  I'm concerned that -- I

5     didn't mean to cut you off, but I'm going to cut you off.

6          MR. MCGLOTHIN:  Okay.  Then I'm going to sit down.

7          THE COURT:  There is a lot here to digest, but where

8     we started this morning was the whole issue of jurisdiction,

9     and what we've, I think, agreed is that the jurisdiction is

10    going to be limited to ancillary jurisdiction.  I have no

11    diversity jurisdiction.  And it's not entirely clear to me

12    exactly what my jurisdiction and authority is in that regard,

13    and I think that needs to be sorted out.

14       I've directed the plaintiff to file an amended complaint

15    in 20 days.  Can you do it in 10 days?

16          MS. TSOUMAS:  Yes, we can, Your Honor.

17          THE COURT:  Okay.  I'll direct that that be done and

18    filed within 10 days.  I'm going to direct the trust and the

19    trustee, who I have directly in focus here, to file -- you

20    can file it under seal, but provide counsel with a copy of

21    something that's a representation of the true and correct

22    assets of the trust as of --

23          MR. JOHNSTON:  Would a balance sheet as of May 1st

24    work?

25          THE COURT:  May 1st, yes.

1          MR. JOHNSTON:  It is a balance sheet you want?

2          THE COURT:  Yes.

3      I'm going to ask the plaintiffs, when they file their

4  amended complaint, should you continue to do that, I want it

5  verified, and I want a declaration filed by Mr. Weiss and

6  Mr. Solomon as to what facts they believe are incorrect, and

7  Mr. Dean's accounting of what he told them and when he told

8  them and what he gave them and when he gave it to them.  I

9  want to know those two gentlemen, if they're still with us,

10 what they have to add.

11     I'm going to defer a ruling on the preliminary injunction

12 at this point, pending further order of the court, and I'm

13 going to want additional briefing within 20 days as to the

14 jurisdictional issues, the plaintiff's views now on what I

15 can and should do.

16     Clearly, I'm not going put a stop sign on the trust and

17 allow it to not disburse funds in a reasonable fashion.

18     One of the problems I have with this case is that I think

19 that the ability to pay some of those judgment creditors at a

20 discount and take those, I don't have a problem with that.

21 You haven't convinced me that that wasn't other than good

22 lawyering.

23     Now, it may have been for the purpose of shielding the

24 trust assets, and it may have been for purposes of creating a

25 large wall against the creditors, and it may have been for

1   purposes which may have been to prevent other creditors

2   from -- but it may also have been legitimate.  And the

3   likelihood of success, it seems to me, on the plaintiffs,

4   ultimately, recovering and finding assets and having priority

5   over these other judgments is a real problem.

6       So what I'd like is the amended complaint within 10 days,

7   the accounting within ten days, and further briefing within

8   20 days.  We'll have minutes, and we'll tell you what these

9   dates are.  But I'd like further briefing on what you think

10  my jurisdiction is, and what you are requesting in the way of

11  injunctive relief, and anything else you want to tell me in

12  not more than 24 pages a side.

13      Let's have simultaneous briefing, and if I need response,

14  I'll ask for it, and I think that's what we can do today.

15  I've spent an enormous amount of time reading all of this,

16  and, ultimately, it may well be that I will -- and give me

17  your views on a special master.  Maybe we have a trial here

18  in June, and we just let it all hang out and see what we

19  learn.

20      But when we get all through the end of the day, I'm not

21  sure I'm seeing the plaintiff recovering a lot of money in

22  this case.  You might -- you've got a big judgment already,

23  but finding the assets, which aren't encumbered, seems like a

24  long road ahead.

25      That having been said, I'm very concerned with some of the

1    aspects of what I have learned about what Mr. Dean and the

2    trustee have done and how they've created some of these

3    things.  And I'm particularly concerned with CCRB, how it was

4    organized, what it's -- it really doesn't have a business

5    purpose.  So there's a lot about what we've read that I'm

6    troubled by.  Perhaps not as much as counsel, but I'm

7    troubled by some of those things that we've learned.

8        But I'm not prepared to do anything further other than ask

9    for more guidance from you, as I've outlined.

10       Any questions?

11           MR. BORDE:  Does Your Honor contemplate further

12   argument after this supplemental briefing?

13           THE COURT:  That will remain to be seen.

14           MR. MCGLOTHIN:  Your Honor, the declarations of

15   Mr. Weiss and Mr. Solomon should be filed within ten days as

16   well?

17           THE COURT:  I think so.

18           MS. TSOUMAS:  Your Honor, given I don't know their

19   availability in the next week, we'd ask to have a little more

20   time on those.

21           THE COURT:  I said briefing in 20 days, I think.

22   Let's make it 20 days.

23           MS. TSOUMAS:  So the complaint in ten days?

24           THE COURT:  Ten days, complaint; additional briefing

25   by the parties in 20 days, including the declarations from

1   your side, those two gentlemen, and the accounting from the

2   trust side in 20 days.

3        Let's give you dates certain.  So ten days from today,

4   let's say the 15th of May for the amended complaint.  One of

5   the things the plaintiff ought to consider is just bringing

6   these claims under the other case, or allowing me to

7   consolidate them, or something.  I mean, I -- in any event,

8   15 days -- May 15, and then we'll just say May 30 for

9   everything else that's due.

10       And then as soon as we get all those materials, we'll

11  probably have a status conference or something, and try and

12  figure out how we're going to proceed.

13       Any questions?

14       Have a nice day.  We'll be in recess.

15       Oh, I know there is another motion for sanctions.  I think

16  what we should do is just stay that motion, not ask for a

17  response at this moment, but...

18            MR. JOHNSTON:  That's agreeable, Your Honor.

19            THE COURT:  Can we strike it without prejudice?

20            MR. JOHNSTON:  I think we can, Your Honor.  We've

21  already met the safe harbor rules and so forth, and I think

22  looking at new pleading coming in.

23            THE COURT:  We'll strike it without prejudice.

24       We'll be in recess.  Have a nice day.

                 (The proceedings concluded at 12:13 p.m.)

C E R T I F I C A T E


            I, Nancy L. Bauer, CCR, RPR, Court Reporter for

the United States District Court in the Western District of

Washington at Seattle, do hereby certify that I was present

in court during the foregoing matter and reported said

proceedings stenographically.

            I further certify that thereafter, I have

caused said stenographic notes to be transcribed under my

direction and that the foregoing pages are a true and

accurate transcription to the best of my ability.



            Dated this 11th day of May 2018.



                              /S/   Nancy L. Bauer

                              Nancy L. Bauer, CCR, RPR
                              Official Court Reporter